**In re HASKELL DAWES, INC., Debtor.**

**Bankruptcy No. 95–15723DWS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 28, 1996.

Michael J. Cordone, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Reed–Chatwood, Inc.

Joshua Z. Goldblum, Feasterville, PA, for Dean A. Stenberg.

Eric L. Frank, Miller and Miller, Philadelphia, PA, for Precision Wood Products, Inc.

Leona Mogavero, Lesser & Kaplan P.C., Blue Bell, PA, for Meridian Bank.

Ina Weiner, Philadelphia, PA, for Internal Revenue Service.

Joseph Minni, Philadelphia, PA, United States Trustee.

### *OPINION*

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Debtor's request for confirmation of its Amended Plan of Reorganization, objection to which has been filed by Dean A. Stenberg ("Stenberg"). Hearings were held on April 29, 1996, June 4, 1996 and July 11, 1996. Filed as a small business case entitled to the streamlined procedure intended to be provided such debtors by Congress in the Bankruptcy Reform Act of 1994, this case evidences the reality that the amount of debt to be dealt with in a Chapter 11 case does not necessarily determine the speed with which a business can be reorganized.[1] Thus, this Debtor finds itself one year after its filing on July 26, 1995 in a contest with its largest creditor with confirmation still an elusive goal. While we are

---

1. The tortured path of this Chapter 11 case was quickly forecast when the Debtor's motion under § 1102(a)(3) that a creditors' committee not be appointed was opposed by three creditors, including Stenberg. The motion was subsequently denied, *In re Haskell–Dawes, Inc.*, 188 B.R. 515 (Bankr.E.D.Pa.1995), and a committee was appointed.

not prepared to conclude that a reorganization is not possible for this Debtor, we must sustain the Stenberg objection insofar as it contends the plan is not fair and equitable because equity is retaining its interests while unsecured claims are not being paid in full as required for confirmation under § 1129(b)(2)(B).[2] In so concluding, we have focused our analysis on the Debtor's effort to come within the "new value exception" to the absolute priority rule.

### BACKGROUND

Debtor is in the business of designing and building textile twisting machines and replacement parts for sale to the manufacturers of twisted rope. It operates its business in premises owned by and leased from H–D Acquisition which is a company owned by Debtor's equity holders, A. Allen and Eleanor Woodruff. *See* Transcript, 4–29–96, at 62, 86. The Woodruffs purchased the business assets from Stenberg in November 1992. As a result of that sale, Stenberg is the largest creditor of the Debtor asserting a claim of $285,000. Total unsecured claims aggregate approximately $500,800. Other than one other large claim of Reed–Chatwood, the seller of two unsuccessful lines of equipment to the Debtor, in the amount of $120,000, the remaining unsecured creditors are limited in number and amount. According to the Debtor's Disclosure Statement, "unable to meet its financial obligations to Stenberg, Reed–Chatwood, and falling behind with certain vendors, the Debtor was already contemplating seeking bankruptcy relief when the IRS liened its assets for failure to pay federal taxes." Disclosure Statement at 10.

On December 22, 1995 Debtor filed its Plan of Reorganization ("Plan"). Objections

were filed by the Official Creditors' Committee which had been recently formed and hired counsel,[3] Stenberg, Reed–Chatwood, John Guay and the Internal Revenue Service. Moreover, the Plan was overwhelmingly rejected in amount although not in number of unsecured claims. Rather than press confirmation in light of the objections, Debtor sought and was granted a series of continuances during the first quarter of 1996 in order to negotiate with the Committee in the hope of achieving a consensual reorganization. On April 8, 1996, Debtor filed an Amended Plan of Reorganization ("Amended Plan") which changed the treatment of unsecured claims, reflected an increase in the capital contribution from the Woodruffs and resolved issues with Meridian Bank.[4]

The Amended Plan which is the subject of this contested matter provides for treatment of classes of claims and interests as follows:

Class A—Super–Priority Administrative claim of Meridian Bank as treated under a court-approved stipulation.

Class B—Administrative claims of professionals, including Debtor's attorneys, accountants and appraiser and Unsecured Creditors' Committee counsel, to be paid in full.

Class C—Secured claim of the Internal Revenue Service.

Class D—Secured claim of Meridian per the above referenced stipulation.

Class E—Secured claim of Amcore Bank per original contract.

Class F—Priority claims of taxing authorities.

Class G—Unsecured claims of $200 or less to receive 75% dividend one year after the Effective Date.

---

**2.** Stenberg had also objected to the adequacy of the Debtor's Disclosure Statement which was given conditional approval on November 22, 1995 as well as the feasibility of the Amended Plan, 11 U.S.C. § 1129(a)(11). Those objections were overruled at the hearing held on June 21, 1996.

**3.** Members of the Committee were Stenberg who was elected its chair, Reed–Chatwood, Transmission Engineering Co., Inc., Pryan Bearings Co., Inc. and Metal Supermarkets. Debtor objected to the Committee's Application to Employ Eric Frank, Esquire as its counsel because of the

payment arrangement which contemplated a guarantee by Stenberg and Reed–Chatwood. That objection was overruled.

**4.** To secure Meridian Bank's consent to the Amended Plan, Debtor was required and did reaffirm its "continuing liability under the Suretyship Agreement evidencing its intent to be liable for all debts of H–D Acquisition Corp., Inc. to Meridian Bank...." Stipulation Resolving Meridian Bank's Response to Debtor's Plan of Reorganization, Exhibit A to Amended Plan.

Class H—Unsecured claims in excess of $200 to receive pro rata distribution of $15,000 three months after the Effective Date and quarterly payments beginning three months after the fourth year after the Effective Date as follows: [5] pro rata distribution of $3000 for a period of 20 quarters, pro rata distribution of $7000 for a period of four quarters and pro rata distribution of $8000 for a period of four quarters, with all payments to be secured by a lien on the Debtor's assets junior to those of Meridian and the IRS.[6]

Class I—Unsecured claim of A. Allen Woodruff shall receive no distribution.

Class J—Equity interests of Woodruffs to be retained.

According to the Amended Plan, funding of the plan is to be provided from continued business operations and contributions from the Woodruffs aggregating $77,200 over the life of the Amended Plan as follows: [7] $20,000 on the Effective Date, $5,000 within three months thereof and $600 monthly beginning on the Effective Date. The source of the $600 payments is the excess rent for the building not being paid by H–D Acquisition to the mortgagee. *See* Transcript, 4–29–96, at 62.

Confirmation of the Amended Plan under § 1129(b) was sought on April 29, 1996 at which time Stenberg and Guay were the only creditors still pressing their objections.[8] After hearing the testimony of Mr. Woodruff, the Court refused to confirm the Amended Plan because the availability of the new value contribution was speculative and the IRS settlement had not been memorialized and filed on notice to creditors. Confirmation was continued until June 4, 1996 and, at a hearing held on that date, the Debtor satisfied those two impediments to confirmation.[9] However, the objections to confirmation were pressed and a further hearing was held on June 20, 1996 at which Mr. Woodruff gave additional testimony as to the new value to be contributed and the feasibility of the Amended Plan. Finding that the operations of the business established plan feasibility, the only remaining issue is whether this plan can be confirmed over the objection of Stenberg based on the Woodruffs' proposed capi-

---

**5.** The Amended Plan also allows each Class H claim holder to elect to reduce its claim to $200 and have it treated as a Class G claim. *See* Amended Plan, Article III, 8(c).

**6.** In preparing this Opinion, we noted an inconsistency between the treatment of the Class H Claimants under the Amended Plan and the projected cash flow statement submitted by the Debtor in support of confirmation. *See* Exhibit D–5. According to the projected cash flow statement, the quarterly payments begin in the first year of the plan rather than in the fourth year. The record, as developed at the hearings, contains no explanation for this inconsistency. When alerted to this problem, Debtor filed a Motion to Amend and Supplement Pleadings and Exhibits to Conform to Evidence, wherein the Debtor explains that the inconsistency is the result of a typographical error. According to Debtor, "payments to Class H, general unsecured creditors, are to begin three months after the effective date, not, three months the fourth year after the effective date." There being no objection to the Motion, we have entered an Order allowing the Supplemental Amendment to Article III, Paragraph 8(b) believing that amendment to be consistent with the Debtor's testimony and more favorable to creditors than the provision as erroneously stated in the Amended Plan.

Giving effect to the curative amendment, we calculate that based on unsecured claims esti-

mated at $500,000, a Class H Claimant will receive a 3.6% dividend four months after confirmation. Payment of approximately .6% per quarter will continue until the end of year five. In year six the quarterly dividend will increase to 1.4% (5.6% annualized) for one year and in year seven will increase to 1.6% for one year (6.4% annualized). Creditors will receive a total of $135,000 or 27% over the seven year life of the plan with 44% of the distribution to be made in years six and seven. The Plan as originally filed, on the other hand, provided a one time pro rata distribution of $100,000, or 20%, between years four and five.

**7.** Under the original Plan, the Woodruffs were only to contribute $20,000 on the Effective Date.

**8.** Shortly after the Amended Plan was filed, three of the members of the Creditors' Committee resigned, and the Committee was therefore dissolved for insufficient membership. The IRS's claims were resolved by a Stipulation subsequently filed and approved by the Court and made part of the Amended Plan.

**9.** Mr. Woodruff attended that hearing with a certified check for $25,000 representing the Effective Date payment of $20,000 and the payment of $5000 due within three months.

tal contribution to the reorganized debtor.[10] We turn to this issue next.

## DISCUSSION

■ Since Debtor's Plan was not accepted by every impaired class of claims, it does not satisfy the requirements of § 1129(a)(8). As such, it may only be confirmed pursuant to the so-called cram down provisions of § 1129(b), which bring into play the absolute priority rule. The absolute priority rule, which is set forth in 11 U.S.C. § 1129(b)(2)(B)(ii), requires that " 'a dissenting class of unsecured creditors ... be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.' " *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (*quoting Ahlers v. Norwest Bank Worthington (In re Ahlers),* 794 F.2d 388, 401 (8th Cir.1986)). *See also In re Sovereign Group 1985–27, Ltd.,* 142 B.R. 702, 705 (E.D.Pa.1992); *In re Wynnefield Manor Associates, L.P.,* 163 B.R. 53, 56 (Bankr.E.D.Pa.1993). Since in this case, the Woodruffs, as equity holders, are in a class of creditors junior to the dissenting unsecured creditors in Class H whose allowed claims are not being paid in full,[11] application of the absolute priority rule would appear to bar the Woodruffs from retaining any property, including their ownership interest, in the reorganized debtor. However, the Woodruffs are seeking to utilize the new value exception to overcome this rule.[12]

■ The new value exception allows existing equity holders to retain (*i.e.,* buy back) their ownership interests in the reorganized debtor over the objection of any senior dissenting unsecured creditor class that is not being paid in full if the equity holders make a new capital contribution to the debtor that meets certain criteria. *See* J. Ronald Trost et al., *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification,* CA46 ALI–ABA 479, 507 (1995). This criteria has been developed through case law, relying in large part upon dicta from *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) (*"Case"*), wherein the Supreme Court stated:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Railway Co. v. Boyd,* [228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913) ] and *Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* [271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926) ]. Especially in the latter case did this Court stress the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.... [W]e believe that to accord 'the creditor his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution

---

**10.** Guay withdrew his objection on the eve of the last hearing.

**11.** Class G also constitutes a class of unsecured creditors whose allowed claims are not being paid in full. However, Class G accepted the Plan. *See* D–2 ("Debtor's Report of Plan Voting") at 2.

**12.** We agree with those authorities that do not view the contribution of new value to be an exception to the absolute priority rule. *See e.g., In re Woodbrook Associates,* 19 F.3d 312, 320 (7th Cir.1994); *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),* 2 F.3d 899, 906 (9th Cir.1993) ("the term '[new value] exception' is misleading [since the] doctrine is not actually an exception to the absolute priority rule but is rather a corollary princi-

ple, or, more simply a description of the limitations of the rule itself"), *vacatur denied, U.S. Bancorp Mortgage Company v. Bonner Mall Partnership,* —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); *In re SM 104 Ltd.,* 160 B.R. 202, 224–225 (Bankr.S.D.Fla.1993) ("new value exception" is not an exception at all, but merely a corollary to the absolute priority rule); Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations,* 44 Stan.L.Rev. 69, 96 (1991) ("use of the term 'exception' to describe new.value principles is a catachresis"; "[t]he conditions required to satisfy the new value 'exception' also satisfy the absolute priority rule"). However, for the purpose of this discussion, we will refer to it as such as the parties have framed the issue in those terms.

in money's worth, reasonably equivalent in view of all of the circumstances to the participation of the stockholder.

*Id.* at 121–122, 60 S.Ct. at 10.[13] *See Norwest Bank Worthington v. Ahlers*, 485 U.S. at 203, 108 S.Ct. at 966–67 (referring to the aforementioned passage from *Case* as dicta). Based on this passage, courts have held that equity holders seeking to utilize the new value exception must provide a capital contribution that is: (1) in the form of money or money's worth; (2) necessary to the reorganization; and (3) reasonably equivalent to the value of the interest being retained. *See e.g., Oxford Life Insurance Company v. Tucson Self-Storage, Inc.*, 166 B.R. 892, 899 (9th Cir. BAP 1994) (*citing Case, supra*, at 121–122, 60 S.Ct. at 10–11); *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir.1992) (*citing Case, supra*, at 121–122, 60 S.Ct. at 10–11); *In re Sovereign Group 1985–27, Ltd.*, 142 B.R. at 708 (*citing Case, supra*, at 122, 60 S.Ct. at 10–11). In addition, courts have added the requirement that the contribution be "up front" and substantial. *See In re Union Meeting Partners*, 165 B.R. 553, 570 (Bankr.E.D.Pa. 1994), *aff'd*, 52 F.3d 317 (3d Cir.1995) (table); J. Ronald Trost *et al., Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, supra*, at 543–544 ("substantiality test was not one of the original requirements for applying the new value exception articulated in [*Case* ]," but has "since been adopted by a significant number of courts as an additional requirement"). *See also Oxford Life Insurance Company v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*, 166

B.R. at 899 (construing *Case* as requiring new capital contribution to be: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received). The burden of proving that each of these requirements is met is on the plan proponent. *Id.* at 899; *In re Tallahassee L.P.*, 132 B.R. at 718. *See also Farmers Home Administration v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 654 (9th Cir. BAP 1994) ("debtor carries the burden of proving that a Chapter 11 plan complies with the statutory requirements for confirmation under §§ 1129(a) & (b)"), *aff'd*, 85 F.3d 1415 (9th Cir.1996); *266 Washington Associates v. Citibank, N.A. (In re Washington Associates)*, 147 B.R. 827, 830 (E.D.N.Y.1992) (burden of proof on confirmation "rests squarely on the plan's proponent").

### A. Capital Contribution Must Be In The Form Of Money or Money's Worth and Must Be Made "Up Front"

■ The Woodruffs propose to make their new capital contributions to Debtor by paying: (i) $25,000 on the "Effective Date";[14] and (ii) $600.00 per month beginning on the Effective Date. Obviously, these contributions meet the "money's worth" requirement. In addition, the $25,000 one-time payment as well as the first installment of the $600 monthly payments also satisfy the requirement that the investment be a "present contribution, taking place at or before the effective date of the plan, not a contribution in the

**13.** While *Case* was decided under the Bankruptcy Act, we agree with those courts and commentators who have concluded that the new value exception remains viable under the Bankruptcy Code. *See e.g., Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d at 905–917; *Bank of America, Illinois v. 203 North LaSalle Street Partnership*, 195 B.R. 692, 707–708 (N.D.Ill.1996); *In re Duval Manor Associates*, 191 B.R. 622, 635 (Bankr. E.D.Pa.1996) (Raslavich, J.); *In re One Times Square Associates Limited Partnership*, 159 B.R. 695, 706–707 (Bankr.S.D.N.Y.1993), *aff'd*, 165 B.R. 773 (S.D.N.Y.), *aff'd*, 41 F.3d 1502 (2nd Cir.1994) (table), *cert. denied*, —— U.S. ——, 115 S.Ct. 1107, 130 L.Ed.2d 1072 (1995); *In re Tallahassee Associates, L.P.*, 132 B.R. 712, 715–717 (Bankr.W.D.Pa.1991) (Markovitz, J.); *In re Mort-*

*gage Investment Company of El Paso, Texas*, 111 B.R. 604, 618 (Bankr.W.D.Tex.1990).

**14.** The Amended Plan defines the "Effective Date" as "the twentieth Business Day following the date the Order of Confirmation becomes a Final Order." Amended Plan at 5. Under the terms of the Amended Plan, the Woodruffs are required to contribute $20,000 on the Effective Date and $5,000 three months after the Effective Date. However, as previously noted, *see* footnote 9 *supra*, the Woodruffs proffered the full sum at confirmation. Accordingly, for purposes of applying the new value exception, we will assume that the full $25,000 will be contributed to the Debtor on the Effective Date and will treat the Amended Plan as requiring the same.

future." *In re Sovereign Group 1985–27, Ltd.*, 142 B.R. at 709 (citations omitted). However, the $600 monthly payments that are to be made after the Effective Date do not.[15] Contributions in the form of future payments do not constitute present or "up front" capital contributions. *See In re Stegall*, 85 B.R. 510, 514 (C.D.Ill.1987) ("A review of the case law reflects that the courts require that any contribution of new capital must be made 'up front,' and not in the form of future payments."), *aff'd*, 865 F.2d 140 (7th Cir.1989); *In re Union Meeting Partners*, 165 B.R. at 570 ("a promise to pay money in the future . . . is not money or money's worth paid 'up front'"); *In re Yasparro*, 100 B.R. 91, 98 (Bankr.M.D.Fla.1989) ("since payments under promissory notes would be made monthly over ten years, the promissory notes constitute a future contribution rather than a present one"); *In re Future Energy Corporation*, 83 B.R. 470, 499 (Bankr. S.D.Ohio 1988) ("It is well established that a new capital investment must be a present contribution, not a contribution promised in the future."); *In re Hendrix*, 131 B.R. 751, 753 (Bankr.M.D.Fla.1991) (promise to make future monthly payments to Debtor is "not a present contribution with value to the unsecured creditors today"). A present or "up front" contribution "is essential so that it may be liquidated by the creditors should the reorganization effort fail." *In re Sovereign Group 1985–27, Ltd.*, *supra*, at 709. *Accord Norwest Bank Worthington v. Ahlers*, 485 U.S. at 204, 108 S.Ct. at 967 (promise of future services does not satisfy "money or money's worth" requirement because it "cannot be exchanged in any market for something of value to the creditors today"). *See also* Katherine Kruis, *A Framework for Application of the New Value Exception*, 21 Cal.Bankr.J. 199, 216 (1993) (contribution which satisfies the "money's worth" requirement "should be (1) an asset in the accounting sense, (2) tangible, alienable, and enforceable, and (3) a present contribution that can be levied upon at the time of plan approval."). Accordingly, in applying the remaining criteria of the new value exception, we will consider the Woodruffs' new value contribution to be $25,600.[16]

### B. The Contribution Must be Necessary To the Reorganization

Courts have adopted various approaches in applying the requirement that an equity holder's contribution be "necessary" to a debtor's reorganization.[17] *See* Katherine Kruis, *A Framework for Application of the New Value Exception*, *supra*, at 205. However, most courts seem to agree that this requirement is met if: (i) the contribution will be used to fund repairs or improvements to the debtor's property that are necessary to its reorganization; or (ii) the contribution is needed to enable the debtor to make payments due under the plan of reorganization and continue operating. *See State Street Bank and Trust Company v. Elmwood, Inc. (In re Elmwood)*, 182 B.R. 845, 853 (D.Nev. 1995) (capital contribution to be used for deferred maintenance and rehabilitation of property was necessary); *In re Duval Man-*

---

15. Mr. Woodruff testified that H–D Acquisitions would enter into an agreement with Debtor to assign $600 of the rent collected each month from its tenants to Debtor. *See* Transcript, 4–29–96, at 62. However, neither the Amended Plan nor the Amended Disclosure Statement mention such an agreement. Furthermore, unless the terms of such an agreement were specified or a draft thereof were submitted to the Court, we could not determine whether the agreement would qualify as conveying a present contribution.

16. Although we cannot consider the Woodruffs' commitment to provide $600 per month to Debtor as new value, the Amended Plan would not be feasible without the commitment. *See* footnote 18 *infra*.

17. Some authorities question the rationale for the "necessary" requirement and suggest that it be eliminated from the requirements of the new value exception. *See e.g.*, Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, *supra*, at 112–114; Ralph A. Peeples, *Staying in Chapter 11, Close Corporations and the Absolute Priority Rule*, 63 Am. Bankr.L.J. 65, 80–83 (1989). See J. Trost, J. Samuels, *et al.*, *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification*, *supra*, at 552 (noting that the "National Bankruptcy Conference in its Code Review Project has recommended the elimination of the necessity requirement because the Conference 'doubts the effectiveness of such a provision to accomplish any reorganization goals.' ").

*or Associates,* 191 B.R. at 635–636 (new value contribution was necessary to reorganization of partnership owning eight story apartment building where contribution was to be used to "underwrite plan payments and/or for the rehabilitation of vacant units"); *In re HRC Joint Venture,* 187 B.R. 202, 210 (Bankr. S.D.Ohio 1995) (necessary requirement met where evidence showed that contribution would be used to implement plan payments, provide working capital for operation of business and provide funds for needed renovations to guest rooms in hotel); *In re Dean,* 166 B.R. 949, 956 (Bankr.D.N.M.1994) (capital infusion deemed necessary because reorganized Debtor needed to make certain tenant improvements in order to release lease with existing tenant or attract new tenants to building); *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 345 (Bankr.S.D.Ohio 1992) (where contribution would be used to meet payments proposed under plan and testimony established that contribution was necessary to "establish an operating reserve and to pay current obligations," contribution was deemed necessary); *In re SLC Limited V,* 137 B.R. 847, 855 (Bankr.D.Utah 1992) (where debtor's "current spread sheet showing total income and expenses, new capital contributions, total of claim payments and cumulative net cash flow, indicates that revenue would not be sufficient to pay operating costs and debt service without the new contribution," the contribution is necessary for an effective reorganization); *In re S.A.B.T.C. Townhouse Association, Inc.,* 152 B.R. 1005, 1010 (Bankr.M.D.Fla.1993) (where debtor was a non-profit corporation with no income and testimony demonstrated that debtor did not have sufficient cash to pay all allowed claims and continue operating, debtor met requirement of showing that capital contribution was "necessary"). *See also Case, supra,* at 121 n. 15, 60 S.Ct. at 10 n. 15 (recognizing the capital contributions from old stockholders of debtor were "commonly necessary in equity reorganizations not only to provide new working capital but also to pay dissenting creditors") (citation omitted). *Compare In re Wynnefield Manor Associates,* 163 B.R. at 58 (where there was no evidence that the $25,000 contribution was needed for repairs or otherwise in reorganization process and only apparent use of the funds was to make a nominal payment to unsecured creditors, necessity requirement not satisfied; instead, it appeared that the partners were proposing a small contribution in order to argue that they satisfied the absolute priority rule); *In re Mortgage Investment Company of El Paso, Texas,* 111 B.R. at 620 (where debtors had sufficient cash on hand to pay unsecured creditors, no showing was made that contribution was necessary for continued operations of the business and it appeared that the sole purpose for the contribution was to retain control of the equity ownership under the plan without payment in full of the dissenting creditor class, the contribution was not considered "necessary").

■ According to Alan Woodruff's testimony, the Woodruffs' capital contribution is necessary to fund payments due under the Amended Plan and for working capital. *See* Transcript, 4–29–96, at 66–67. This testimony is consistent with the Amended Plan which states that: "[Debtor] intends to fund payments under this Plan by the continued operation of its business and by the new cash contributions to the Debtor by the Equity Security Holders ...[.]" Amended Plan, Article VI, Paragraph 1. In addition, a review of the projected cash flow statement submitted by Debtor shows that without the capital contribution, Debtor will not have sufficient cash on hand during the first year of the Amended Plan to make the plan payments, including the initial $15,000 dividend to unsecured creditors, and also continue operating.[18] *See* Exhibit D–5. Under these cir-

---

18. According to Debtor's projections, during the first year of the Plan, Debtor will have only $82,447 (the sum of $64,947 representing "Cash Flow From Operations" and $17,500 which is identified as "Cash—Beginning") absent the Woodruffs' new value contribution, to satisfy plan payments totaling $111,729. *See* Exhibit D–

5. With the Woodruffs' new value contribution of $25,600, Debtor's cash on hand will be $108,047. The difference between this amount and the $111,729 due for plan payments will be made up by the Woodruffs' $600 monthly contributions.

cumstances, we conclude that the necessity requirement has been met.[19]

### C. *The Contribution Must Be Substantial*

In determining whether an equity holder's capital contribution is substantial, courts generally consider a combination of two or more of the following factors: the size of the contribution; its relation to the amount of unsecured claims against the estate; its relation to the plan's distribution to unsecured creditors; its relation to the amount of pre-petition claims; its relation to a normal market contribution; and the amount of debt to be discharged. *See e.g., In re Sovereign Group 1985–27, Ltd.,* 142 B.R. at 710 (holding that substantiality of contribution is "measured by considering its size, its relation to the plan's distribution to unsecured creditors, its relation to the unsecured claims against the estate, and its relation to normal market conditions"); *In re Duval Manor Associates,* 191 B.R. at 636 (considering size of contribution, its relation to plan's distribution to unsecured creditors, its relation to unsecured claims and its relation to normal market conditions); *In re SLC Limited V,* 137 B.R. at 855–856 (considering size of contribution, amount of contribution to pre-petition claims and amount of debt to be discharged); *In re Pullman Construction Industries, Inc.,* 107 B.R. 909, 950 (Bankr.N.D.Ill.1990) (in gauging whether contribution is substantial, court must compare the contribution to the total pre-petition claims and the amount of debt to be discharged). Since Debtor is a closely-held corporation, it is unlikely that any comparison can be made between the Woodruffs' contribution and a normal market contribution; normal market contributions do not exist. From among the remaining factors, we find the amount of the contribution, its relation to the amount of unsecured claims and its relation to the plan's distribution to unsecured creditors to be most significant.

We note that in the context of a closely-held corporation such as the one at issue here, our colleague Chief Judge David A. Scholl frames the analysis somewhat differently. He contends that, in such cases, only the following two factors are relevant, with primary emphasis on the first one: "(1) whether the proposed payment represents the partner's best efforts; and (2) the amount of the contribution, or the percentage of the return on their claims, projected to creditors." *In re Wynnefield Manor Associates,* 163 B.R. at 56–57. *See also In re Capital Center Equities,* 144 B.R. 262, 269–270 (Bankr.E.D.Pa.1992) ("an emphasis on whether the payment proposed represents the Debtor's best effort is the proper focus in a case involving a debtor who is an individual or is made up of a small group of interest holders rather than, exclusively, the amount of the contribution or the percentage of the return projected to creditors"). *But see In re 8315 Fourth Avenue Corporation,* 172 B.R. 725, 739–740 (Bankr.E.D.N.Y.1994) (rejecting debtor's contention that "inasmuch as it is a small, private corporation," the court should find that the proposed value contributions by the shareholders were substantial because they represent the shareholders'

---

19. Stenberg contends that since the "administrative claims of the Debtor to be paid on the effective date are over $30,000," the recipients of the Woodruffs' new value contribution "will be Debtor's lawyer and accountant and not the Class H Claimants." Memorandum of law of Dean A. Stenberg Opposing Confirmation of Plan at 4. We reject this contention. When the Woodruffs contribute their $25,600 in new value to Debtor on the Effective Date, it will be mixed with Debtor's current cash on hand which, according to Debtor's projected cash flow statement, is $17,500. When payments are made from this fund, there will be no means of determining whether the source of such payments is the Woodruffs' new value contribution or the Debtor's $17,500. Furthermore, pursuant to the terms of the Plan, Debtor's attorneys' and accountants' fees will not be paid on the Effective Date. Rather, they will be paid "only after court approval." Since the Class H Claimants are to receive a $15,000 cash payment "[t]hree months after the Effective Date," it is quite possible that the Class H Claimants will receive their $15,000 payment before Debtor's attorneys or its accountants receive payment of their fees. In addition, Mr. Woodruff testified at the confirmation hearing that he believed Debtor's attorneys had obtained a $15,000 retainer. If this testimony is correct, then only $15,000 of professional fees (if approved) remain to be paid. Since Debtor's cash flow statement indicates that it has $17,500 in cash on hand as of June 1, 1996, it would have sufficient cash to pay its administrative claims without regard to the Woodruffs' contribution.

best effort). We agree that, in the context of close corporations, it is appropriate to consider the shareholders' best efforts in determining the substantiality of the contribution.

■ Applying the factors we consider most significant, we find that the Debtor has not met its burden of establishing that the Woodruffs' $25,600 contribution is substantial. Based on scheduled unsecured non-priority claims of $501,276.00, the contribution equals approximately 5.1%.[20] This percentage is slightly less than the 5.9% in *In re Union Meeting Partners,* 165 B.R. at 570, where the new value contribution was $200,000. However, it is slightly higher than the percentage found in most other cases which we uncovered where the contribution was held not to be substantial. For example, in the only decision which Stenberg cited on the issue of substantiality in his memorandum of law, *In re Sovereign Group 1985–27, Ltd.,* 142 B.R. at 710, a contribution representing only 3.6% of the unsecured debt of the Bank and exceeding the interest being retained in debtor by 37%[21] was found not to be sufficiently substantial to allow the debtor to avail itself of the new value exception. *See also In re Woodbrook Associates,* 19 F.3d at 320 (new value contribution of $100,000 which amounted to at most 3.8% of approximately $2.6 million of total unsecured debt was not substantial); *In re Snyder,* 967 F.2d 1126, 1131–1132 (7th Cir.1992) (new value contribution of $30,000 which amounted to only 2.7% of $1,100,000 due unsecured creditors not substantial). Moreover, the Woodruffs' 5.1% contribution is higher than the 4.2% at issue in *In re Duval Manor Associates,* 191 B.R. at 635–636, wherein Judge Raslavich ruled that the partners' aggregate contribution of $100,000 qualified as substantial.

While useful as an objective means of sorting through the facts and circumstances that are at issue in a given case, mathematical relationships such as the foregoing are often of minimal utility in determining the substantiality of a contribution. The 5.1% standing alone is neither so *de minimus* nor so fulsome as to be dispositive of the ultimate question. Rather we must take this one fact and consider it with other facts and circumstances of this case to reach our conclusion. *See, e.g., In re Snyder,* 967 F.2d at 1131–1132 ("There is no mathematical formula for resolving the substantiality issue and it will depend upon the circumstances of the individual case."); *State Street Bank and Trust Company v. Elmwood, Inc. (In re Elmwood, Inc.),* 182 B.R. 845, 852–53 (D.Nev.1995) (while "a contribution that is a 'merely nominal or gratuitous, token cash infusion[ ]' proposed primarily to buy cheap financing' does not qualify as substantial[,] ... no mathematical relationship defines when a cash infusion is substantial"; rather, the "inquiry depends upon the circumstances of each case").

Where, as here, the mathematical relationship neither compels a finding of substantiality nor lack of substantiality, we next turn our attention to the relationship between the amount of the contribution and the plan's distribution to unsecured claimholders.[22] Class H members are to receive approximately $135,000 over the life of the plan. Since these claims total approximately $500,-

---

20. According to the Amended Plan, the unsecured claims in Class G (claims of $200.00 or less) amount to approximately $800.00 and the unsecured claims in Class H (claims in excess of $200.00) amount to approximately $500,000.00 for a total of $500,800.00. Debtor's Schedules listed Debtor's non-priority unsecured debt as $501,276.00. These figures are not significantly different.

21. The retained interest of $215,000 was compared to the contribution of $135,000. In this case because the Debtor has not provided sufficient information for us to calculate the Woodruffs' retained interest, we are unable to include this criterion in our analysis.

22. Under the terms of the Amended Plan, unsecured creditors included in Class G (i.e., claims

of $200 or less) are to receive a payment equal to 75% of their claims within one year after the Effective Date. Since Class G claims total approximately $800, this means that Class G claimholders will receive payments totaling about $600. While this class created for administrative convenience has accepted the plan, we nonetheless find the Debtor's decision to discount full payment and withhold distribution for one year to these small creditors probative of the issue before us. Presumably Mr. Woodruff would have easily been able to contribute an additional $800 to allow these creditors to be paid in full upon the Effective Date. However, since this class represents a mere fraction of the claims, our focus will be on the treatment of Class H.

000, Debtor will pay the Class H members approximately 27% of their allowed claims. However, under the Amended Plan as recently supplemented, this amount is to be paid over a 7 year period, in quarterly installments after the initial 3.6% dividend. Moreover, 44% of the distribution is not made until years 6 and 7. Given the time value of money and the difficulty of creditors' ensuring the actual payment of these sums in the distant future, the 27% dividend has less value than would appear at first blush.

Turning to Judge Scholl's best efforts test, we note Mr. Woodruff's testimony, on direct examination and without embellishment, that the Woodruffs' contribution constituted their best efforts. However, on cross examination, when he was asked about his personal finances, including the amount of cash he had available and the extent of his bank accounts, his answers were non-responsive and at times evasive. At one point, he testified that the IRS had seized the Woodruffs' personal bank accounts, but when pressed to identify these accounts, he admitted to the existence of only one. His explanation of the manner in which he raised the $25,000 deposit in the period between the first and second confirmation hearing through the sale of various items he buys for resale [23] left the Court with questions about his potentially available funds. Our impression of Mr. Woodruff is that he is a very resourceful man. Had he been more forthcoming about the Woodruffs' financial situation, we might be able to find that the contribution did indeed represent their best efforts. Based on the testimony we heard, we regretfully cannot.

Considering all of the relevant factors, we conclude that, based on this record, the substantiality requirement has not been established. Since Debtor has not met this requirement of the new value exception, confirmation of the Amended Plan must be denied. Recognizing, however, that we have never before addressed the new value exception, we will permit Debtor another attempt at achieving confirmation consistent with this Opinion if it should choose to do so. *In re Sawmill Hydraulics, Inc.,* 72

B.R. 454 (Bankr.C.D.Ill.1987). *See also In re Capital Center Equities,* 144 B.R. at 270 (denying debtor's third amended plan of confirmation but allowing debtor "one further attempt at achieving confirmation" in the form of a consensual or a fourth amended plan). In order to facilitate such further attempt, we will address whether the sole remaining requirement of the new value exception has been met.

### D. The Capital Contribution Must Be Reasonably Equivalent to the Interest Being Retained

The last requirement is whether the amount of the Woodruffs' contribution is reasonably equivalent to the value of the interest being retained. The court in *In re SM 104 Ltd.,* 160 B.R. 202 (Bankr.S.D.Fla.1993), explained the rationale behind this rule, stating:

> Reasonable equivalence is required by § 1129(b)(2)(B)(ii). This is because if a plan purports to give the debtor's prepetition owners the equity interests in the reorganized debtor at a bargain price, the prepetition owners will be receiving something "on account" of their prepetition ownership. Thus, the plan would violate the absolute priority rule.

*Id.* at 226–227. Thus, the "reasonably equivalent" requirement safeguards the integrity of the absolute priority rule by preventing equityholders from retaining their equity interest in a debtor at the expense of the dissenting, impaired unsecured creditors.

Under the terms of the Amended Plan, the Woodruffs are to retain all of the common stock of the Debtor in exchange for their $25,600 contribution of new capital. *See* Amended Plan, Article IX, ¶ 1. As the proponent of the plan, Debtor bears the burden of showing that this retained interest is "reasonably equivalent" to the amount of the Woodruffs' contribution. *In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. at 346; *In re Future Energy Corporation,* 83 B.R. at 502; *In re Sawmill Hydraulics, Inc.,* 72 B.R. 454, 458 (Bankr.

---

**23.** Of the $25,000, $13,000 was from cash on hand and the balance was from the sales of a stainless steel desk and some auto parts and a commission on a paint deal.

C.D.Ill.1987). Stenberg claims that Debtor has not met this burden.[24] We agree.

■ While Debtor produced evidence of the liquidation value of its assets, *see* Exhibit D–7, the liquidation value is not relevant in determining whether the amount of the Woodruffs' contribution is reasonably equivalent to their retained interest in the Debtor. As one authority explained:

> Whatever method of valuation is employed, it is clear that the reorganized enterprise must be valued on a 'going concern' basis rather than as if the assets were to be liquidated. Otherwise, the creditors would be stuck with liquidation valuations while the reorganized premium—the 'upside' to be gained from a successful reorganization—would go entirely to the debtor's equityholders.

J. Ronald Trost *et al.*, *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, supra*, at 556–557. By contributing their $25,600, the Woodruffs are seeking to retain the common stock of a "going concern" and not a company that is slated for liquidation. Therefore, the value of their retained interest must be measured against the Debtor's value as a going concern and not on the basis of its liquidation value.

■ The generally accepted method for determining the value of equity interests in the reorganized debtor is the capitalization of future earnings approach. *In re SM 104 Ltd.*, 160 B.R. at 228; *In re Future Energy Corporation*, 83 B.R. at 500; R. Peeples, *Staying In: Chapter 11, Close Corporations and the Absolute Priority Rule, supra*, at 85 n. 157. *See also In re Beaver Office Products, Inc.*, 185 B.R. 537, 543 (Bankr.N.D.Ohio 1995) ("chapter 11 debtor's 'reorganization value' is based, in part, on the capitalized value of the chapter 11 debtor's future earnings"); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 718 (Bankr.M.D.Tenn.1992) ("Capitalization of future earnings is the starting point for calculation of the value received by the contributor."); J. Ronald Trost et al., *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, supra*, at 557 ("most frequent method used by courts in valuing a business is to capitalize future earnings"). *But see In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass.1991) (determining reorganization value through capitalization of earnings approach is not an appropriate standard to use in applying the new value exception; instead, where the debtor's shares are not publicly traded, the only way to measure the proposed contribution against the actual market value is to offer the stock for sale among the debtor's equity holders and interested creditors). The intricacies of this valuation method are summarized below:

> Although the valuation of an enterprise on the basis of capitalization of prospective earnings is a difficult process, the theory is simple. A projected stream of income in the future has a discounted present value based upon an interest factor, to account for the time value of money, and a risk factor, to account for the possibility that the projected stream of income may never be realized. The process of enterprise valuation thus requires projecting the enterprise's income stream and then determining a discounted present value for that income stream by multiplying the average annual projected income by a multiplier based on an appropriate capitalization rate.

Thus, the determination of the debtor's value as a going concern requires two determinations. First, the future earnings of the reorganized debtor must be projected. These projections must be based, not on past earnings alone, but on factors that may influence income in the future. Of course, mathematical precision is neither possible nor required.

Second, once earnings are projected, the average annual projected earnings are discounted to present value on the basis of a capitalization rate that reflects the expected annual rate of return that investors would require on an investment of comparable risk. This discounting is accom-

---

**24.** We note that although Stenberg contends that the Woodruffs' contribution is not "reasonably equivalent" to the value of their retained interest, he has not made a competing bid for the stock interest of the reorganized Debtor or filed a competing plan.

plished by multiplying the average annual projected earnings by a multiplier that is the inverse of the capitalization rate.... The general standard for determining the appropriate capitalization rate is that the capitalization rate should be consonant with the " 'risk factor of the particular enterprise, measured largely by its past experience and the experiences of businesses similarly situated.' "

*In re Future Energy Corporation,* 83 B.R. at 500–501 (quoting Pachulski, *The Cram Down and Valuation Under Chapter 11 of the Bankruptcy Code,* 58 N.C.L.Rev. 925, 938–941 (1980) (footnotes omitted)). *See also In re SM 104 Ltd.,* 160 B.R. at 211–212.

While the debtor has presented projections of its future earnings, it has not engaged in the second step described above. Accordingly, the record before us contains insufficient evidence to apply the capitalization of earnings approach and determine the "going concern" value of the Debtor in order to determine the value of the Woodruffs' retained interest in the Debtor. *See In re Beaver Office Products, Inc.,* 185 B.R. 537, 543 (Bankr.N.D.Ohio 1995) (where debtor failed to present the court with sufficient evidence to calculate the capitalized value of its future earnings, court could not conclude that shareholders' proposed contribution was "reasonably equivalent" to their proposed equity interest in the reorganized debtor); *In re SLC Limited V,* 137 B.R. at 856 (where parties failed to present evidence regarding an appropriate capitalization rate to be applied to debtor's projected stream of earnings during the Plan, determination of whether value of the capital contribution was commensurate with value retained by investor could not be made); *In re Future Energy Corp.,* 83 B.R. at 499–502 (incomplete record made by proponents at hearing precluded court from determining a value for claim holder's proposed retained interest in the debtor). Since it was Debtor's burden to prove the value of this retained interest and it failed to do so, it has failed to satisfy this last requirement of the new value exception.

▉ So that any further effort by Debtor towards confirmation will be as productive as possible, we will respond to Stenberg's further argument that the Woodruffs' contribution is insufficient in light of certain personal benefits they will receive if the Debtor reorganizes. The United States Supreme Court has recognized that in addition to the "going concern" value of a company, there may be intangible benefits that have value to the equity holders of a debtor that must be added to the equation. In *Norwest Bank Worthington v. Ahlers,* 485 U.S. at 207–208, 108 S.Ct. at 969, the Court stated:

Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property." Whether the value is "present or prospective, for dividends or only for purposes of control" a retained equity interest is a property interest to "which creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatsoever." *Northern Pacific R. Co. v. Boyd,* 228 U.S. at 508, 33 S.Ct. at 561. Indeed even in a sole proprietorship, where "going concern" value may be minimal, there still may be some value in control of the enterprise; obviously at issue is the interest in potential future profits of a now-insolvent business.

Presumably based on this theory, courts have considered as additional value to equity holders various forms of personal benefits. *See e.g., In re Beaver Office Products, Inc.,* 185 B.R. 537, 544–545 (Bankr.N.D.Ohio 1995) (calculation of "value" to be received by equity holders in exchange for their contribution must include consideration of salaries which they will receive from Debtor, releases to be obtained by Debtor in their favor and Debtor's payment of bank's secured claim under plan since equity investors were directly liable for such obligation); *In re BMW Group I, Ltd.,* 168 B.R. 731, 741 (Bankr.W.D.Okla. 1994) (where "owner of business also personally owns the building which is leased to the business at favorable rates," company may be worth more in hands of owner "than in the hands of anyone else"); *In re SM 104 Ltd.,* 160 B.R. at 228–230 (although benefits, such as ability to control reorganized debtor and opportunity to be paid a salary for managing the reorganized debtor, cannot be valued by the capitalization of future earnings

approach, they may have value to the equity holders that should be considered in determining whether the "new value infusion is reasonably equivalent to any quantifiable value being received the purchaser of the equity"); *In re Creekside Landing, Ltd.*, 140 B.R. at 718 (benefits that are personal to an investor such as tax benefits, plan payments that release the investor from liability, and dividends, distributions or even a future salary from the debtor, bear on the value received by that investor); *In re Pullman Construction Industries, Inc.*, 107 B.R. 909, 949 (Bankr.N.D.Ill.1989) (considering retention of ownership and control of company, potential tax benefits, potential future profits, release from personal liability and salaries provided to family members in determining whether contribution was reasonably equivalent to interest being retained).

In applying the teaching of *Ahlers* on this point, it is important to keep in mind that the value that must be paid for is the equity interest being retained and the benefits that flow from that ownership. Incidental personal benefits that the equity interest holder receives, without regard to the benefit they confer, cannot be considered if they do not flow from the equity interest. This point was addressed by the court in *In re Sherwood Square Associates*, 107 B.R. 872, 887 (Bankr.D.Md.1989), in finding that tax benefits that are personal to the equity investors, while a "motivation" for them to invest new value in the debtor, do not constitute "receipt or retention of an interest in property of the Debtor" and retention of such benefits, "in and of themselves, does not constitute a violation of the absolute priority rule."

 Stenberg asserts that in determining the "value" to be received by the Woodruffs, we must consider the following personal benefits that inure to their favor by retention of their equity in the Debtor:

1. Salary, Use of Company Car and Health Benefits—If the Debtor remains in business, Mr. Woodruff will continue to draw a salary from Debtor, will have use of a company car for which the Debtor will provide insurance and will receive health benefits.

2. Reduction in Personal Tax Liability—As Debtor continues in business and pays the trust fund taxes owed to the IRS for payroll fund taxes withheld from its employees' earnings, Mr. Woodruff's personal liability for such taxes will be reduced.

3. Receipt of Rent Payments from Debtor to Haskel–Dawes Acquisition—The Woodruffs will benefit from the Debtor's rental payments to Haskell–Dawes Acquisition, Inc. because it will be able to use such payments to reduce its mortgage which Mr. and Mrs. Woodruff personally guaranteed.

*See* Memorandum of Law of Dean A. Stenberg Opposing Confirmation of Plan at 3. Debtor has not responded to this argument.

The retention of control over the management and profits of the reorganized company is clearly of value to the Woodruffs. It is through this control that Mr. Woodruff ensures his employment with its attendant employee benefits and ensures the continued flow of rental income to H–D Acquisition. Obviously, in today's economic climate, there is substantial value to be gained from retention of one's employment. However, we are mindful of the fact that Mr. Woodruff has agreed to cap his salary at $39,000 per year for the duration of the Plan term. *See* Amended Plan, Article IX, ¶ 3. Given the services which Mr. Woodruff provides to Debtor, the amount of his salary is reasonable from the Court's point of view. Insofar as the car and the health care coverage which Mr. Woodruff will receive, there is no evidence in the record regarding the value of these benefits or whether they are commonly supplied to individuals employed in comparable positions in other companies.

Stenberg is correct that the Woodruffs will benefit from having Debtor rent its operating space from H–D Acquisition. However, this arrangement also benefits the Debtor. According to the only evidence in the record on this matter, Debtor pays less than fair market value for the space it rents. Whether H–D Acquisition would be able to lease the building otherwise is not established in the record. We also recognize, but again cannot quantify, the value of the Debtor's guarantee

of H–D Acquisition's obligations to Meridian Bank which have been reaffirmed by the Woodruff-controlled Debtor under the Amended Plan. Whether a reorganization controlled by a party with less of a self-interest in the payment of that debt would have been successful in discharging all or part of that debt is unclear. In any event the retention of the Meridian liens on the Debtor's assets to secure Debtor and H–D Acquisition obligations, all of which are guaranteed by the Woodruffs, inures to the benefit of the Woodruffs and to the detriment of creditors who receive a junior lien in those assets under the Amended Plan.

The most significant benefit to the Woodruffs' retention of control of the reorganized debtor is their ability to control the deployment of profits from operations. In that regard, Stenberg elicited in his cross examination of Mr. Woodruff his optimistic assessment of the Debtor's future. As a result of his control and management during the Chapter 11 case, the Debtor has more capital assets,[25] more inventory and more income. Mr. Woodruff believes the business is worth more now than one year ago and will increase in value with time. Ostensibly, that is so because the Debtor under Mr. Woodruff's control intends to return its profits to the company by making substantial capital expenditures.[26] Thus, rather than craft a plan that allows creditors to reap the benefit of the reorganized debtor's future, the upside of a successful reorganization is primarily being retained for the equity interests. This additional value to the Woodruffs has not been quantified but our sense is that the ability to control the disposition of profits of $225,000 projected during the plan period has measurable value to them. However, until the full measure of the Woodruffs' retained interest is valued in a subsequent attempt at reorganization, we will refrain from placing a monetary value on such benefits.[27]

As to the issue of potential tax benefits, we note that Mr. Woodruff stands to benefit from Debtor's payment of its past-due trust fund taxes regardless of who owns Debtor's common stock. So long as Debtor reorganizes, the taxes must be paid. Accordingly, we do not view the tax benefits as an item which increases the value of the Woodruffs' retained interest in the Debtor

As provided above, Debtor is being given one last opportunity to achieve confirmation. Any further amended plan shall be filed on or before September 20, 1996. Further proceedings to secure confirmation of such plan will be governed by 11 U.S.C. § 1127 and Fed.R.Bankr.P. 3019.

---

25. During the bankruptcy case, Debtor upgraded its computers, purchasing two new pentium computers, improved its telephone system and purchased a new lathe.

26. Debtor's projected cash flow statement contemplates capital expenditures of $25,000 during the second through fifth years of the Amended Plan, $50,000 during the sixth year and $75,000 during the seventh year. While Mr. Woodruff testified in conclusory fashion that these capital expenditures aggregating $225,000 over the life of the plan are necessary in order to update Debtor's equipment and reorganize, no evidence was offered as to why Debtor believed it necessary to incur capital expenditures in these particular amounts during this period. There was no evidence that Debtor had decided upon what equipment it intended to purchase and/or lease with these expenditures nor that Debtor had priced such equipment to know whether the allotted amount was actually needed to cover the purchase or lease price. Based on the record and the lack of evidence to substantiate the need for these capital expenditures, we cannot rule out the possibility that Debtor could allot less for capital expenditures over the life of the plan and use the excess money to improve its treatment of unsecured creditors.

27. Since we do not in this Opinion attempt to quantify the value of the retained equity interests, rather offering the Debtor another opportunity to meet its burden on a renewed confirmation effort, we will likewise provide Stenberg who has provided little evidence of the value of the personal benefits he cites to make his point, a further opportunity to supplement the record at a subsequent hearing should Debtor re-seek confirmation. We note *Official Creditors' Committee v. Potter Material Service, Inc.*, 781 F.2d 99, 103 (7th Cir.1986), wherein the Court found that where creditors failed to provide any evidence of the value which the equity holder received from control considerations, the bankruptcy court properly refused to consider these potential benefits to the equity holder in determining value of the equity holder's retained interest in the debtor.