In re ELMWOOD, INC., Debtor.

**STATE STREET BANK AND TRUST COMPANY, Appellant,**

v.

**ELMWOOD, INC., and Clark County Treasurer, Appellees.**

Nos. CV–S–94–895–PMP (LRL), CV–S–94–1088–PMP (LRL).

United States District Court, D. Nevada.

May 30, 1995.

---

Laurel E. Davis, Lionel Sawyer & Collins, Las Vegas, NV, for appellant State Street Bank and Trust Co.

Mark Hafer, Mushkin & Hafer, Las Vegas, NV, for debtor, appellee Elmwood, Inc.

Kathleen Jansen, Deputy Dist. Atty., Las Vegas, NV, for appellee Clark County Treasurer.

## OPINION

PRO, District Judge.

State Street Bank and Trust Company ("State Street") appeals the confirmation of the Debtor's plan of reorganization under Chapter 11. After obtaining bankruptcy relief under Chapter 11, the debtor-in-possession, Elmwood, Inc. ("Elmwood"), proposed a "cramdown" plan of reorganization (the "Plan"), which would force a writedown on the secured lender's note and allow Elmwood to retain possession and ownership of the property. Despite objections from State Street, Elmwood's largest creditor, the Bankruptcy Court confirmed the Plan. State Street asserts the Bankruptcy Court committed several errors in confirming the Plan. Because the Court finds the Bankruptcy Court did not err in confirming the Plan, the Court will affirm the decision of the Bankruptcy Court.

## I. Background

The Debtor, Elmwood, Inc., is a Nevada corporation which acquired its primary asset, the Elmwood Villas Apartments ("Elmwood Villas"), at a fourth trust deed foreclosure sale on December 2, 1991. Elmwood purchased its interest in Elmwood Villas, a 156–unit Las Vegas, Nevada, apartment complex, subject to senior liens. State Street currently holds a promissory note secured by the first deed of trust on the property in the principal amount of $4.18 million.

Gang-related crime plagues the Elmwood Villas complex and its value as an income-producing asset decreased dramatically after its acquisition by Elmwood. Unable to complete its obligation due to insufficient income from the property, Elmwood defaulted on the note in October 1992 and did not make any payments for over a year. Consequently, State Street initiated nonjudicial foreclosure and commenced a receivership action in the United States District Court, District of Nevada, Case No. CV–S–93–01149–LDG(RLH). In response, Elmwood filed its Voluntary Petition for bankruptcy protection under Chapter 11 (# 1) on December 13, 1993.

Elmwood filed its initial plan and disclosure statement (# 19) on February 22, 1994,

and with minor amendments it was approved and set for confirmation on April 26, 1994. At the April 26 confirmation hearing, the Court determined that the plan could proceed to cramdown hearings. The Bankruptcy Court scheduled the evidentiary hearing for June 8, 1994. The hearing was later continued to August 4, 1994.

Elmwood's original plan for reorganization, as amended (# 30), divided the undersecured State Street obligation into two separate claims, one secured claim of $1.1 million based on a previously appraised value in the same amount which it classified in Class 3, and one unsecured claim of $3.5 million pursuant to 11 U.S.C. § 1111(b). Elmwood originally classified State Street's unsecured claim with all other unsecured claims in Class 4.

State Street, while it did file objections to the plan, did not timely vote against the plan. Instead, it requested an extension of time to submit ballots rejecting the reorganization plan. If allowed to file late ballots, State Street would have controlled the unsecured class and defeated confirmation with its negative vote, since without its approval there would be no accepting impaired class. See 11 U.S.C. § 1126(c) (1994). The Bankruptcy Court allowed State Street to file late ballots, and also allowed Elmwood to revise its proposed Plan. See Order (# 56).

Elmwood accordingly revised its plan to remove State Street's unsecured deficiency claim from the other unsecured claims through its Revised Amended Disclosure Statement and Reorganization Plan (# 53), filed June 30, 1994. The other unsecured creditors approved the confirmation plan, providing an "accepting class" within the meaning of the cramdown provisions of 11 U.S.C. § 1129(b). See 11 U.S.C. § 1129(a)(10). State Street voted against the Plan, see (# 62), and State Street filed objections to confirmation. See (# 57). The Bankruptcy Court subsequently approved the plan as revised, based upon oral modifications made after the close of evidence.

State Street appeals the confirmation of the reorganization plan. It filed its Opening Brief (# 119) on March 20, 1995, and its

Errata to Appellant's Opening Brief (# 121) on March 21, 1995. Elmwood filed its Answering Brief (# 124) on April 14, 1995. State Street filed its Reply Brief (# 125) on April 27, 1995.

## II. Standard of Review

The Court reviews the Bankruptcy Court's findings of fact for clear error. *In re Fowler,* 903 F.2d 694, 696 (9th Cir.1990). The Court reviews conclusions of law *de novo. Id.*

## III. Discussion

### A. Classification of State Street

■ Section 1122 governs classification of claims for a reorganization.[1] 11 U.S.C. § 1122(a) (1994). The Court reviews questions of whether claims are substantially similar within the meaning of § 1122(a) as a question of fact, under the clearly erroneous standard. *Steelcase, Inc. v. Johnston (In re Johnston),* 21 F.3d 323, 327 (9th Cir.1994) (citing *In re Commercial Western Finance Corp.,* 761 F.2d 1329, 1334 (9th Cir.1985)).

■ The Bankruptcy Court has broad discretion in classifying claims under § 1122. *In re Johnston,* 21 F.3d at 327. In resolving a question of whether claims are "substantially similar," a bankruptcy court must evaluate the kind, species, or character of each category of claims. *Id.* A plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such treatment. *In re Montclair Retail Center,* 177 B.R. 663, 665 (9th Cir. BAP 1995) (citing *In re Johnston,* 21 F.3d at 328).

■ A court must not approve a classification scheme designed solely to manipulate class voting. *Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture, (In re Greystone III Joint Venture),* 995 F.2d 1274, 1279 (5th Cir.1991). In the Ninth Circuit, the Bankruptcy Appellate Panel places the burden on the Debtor to offer a business or economic justification for the separate classification of unsecured claims, or to show a legal distinction between the claims. *See In re Montclair Retail Center,* 177 B.R. 663, 665; *Oxford Life Ins. Co. v. Tucson Self–Storage (In re Tucson Self–Storage),* 166 B.R. 892, 898 (9th Cir. BAP 1994).

■ It is not enough to justify separate classification on the basis that the unsecured claim derived from an undersecured claim under the Code. *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987); *In re Greystone III Joint Venture,* 995 F.2d at 1279; *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.,* 987 F.2d 154, 159–61 (3d Cir.1993), *reh'g denied, en banc* (3d Cir.1993); *In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). Further, it is not enough to justify separate classification on the basis of the unsecured creditor's right to make a § 1111(b)(2) election. *In re Tucson Self–Storage,* 166 B.R. at 897. Finally, it is not enough to justify separate classification based on the administrative convenience exception except in those cases where the unsecured claims are numerous and small in amount. *Id.* at 898.

■ State Street challenges Elmwood's classification of State Street's unsecured claim in a separate class from other unsecured claims under 11 U.S.C. § 1122(a). State Street asserts that Elmwood classified its unsecured claim separately only to procure the necessary votes of an impaired class under the cramdown provisions. The Bankruptcy Court determined that Elmwood properly classified appellant State Street's claims in the plan of reorganization, and confirmed the plan over State Street's objections.

Under the terms of the Plan, State Street, as a Class 4 unsecured creditor, receives payments differently than the Class 5 unsecured creditors. The Plan provides for minimum monthly payments of 7.9% of the claims for both Class 4 and Class 5. The Plan further provides that the shareholder of Elm-

---

1. Section 1122(a) states:
 (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such claims.
 11 U.S.C. § 1122(a) (1994).

wood, Inc. will infuse initially $50,000 into the refurbishment of the units in the complex. The net operating income ("NOI") generated from all usable units will be used to refurbish the remaining units in the complex, and be used to make the 7.9% payments under the Plan. Once the Class 1 claims are paid in full, the $1000 monthly payments roll over to the Class 5 unsecured claimants. Further, once the Class 2 claims are paid in full, the $1000 monthly payments also roll over to the Class 5 unsecured claimants. Finally, once all units are refurbished, half of the NOI will be paid to State Street. *See* Order Confirming Plan (# 70); Findings of Fact and Conclusions of Law (# 65).

The Bankruptcy Court permitted the separate classification of State Street's Class 4 unsecured deficiency claim from the claims of the Class 5 unsecured creditors since the Plan provides for repayment to these creditors by different means. *See* Findings of Fact and Conclusions of Law (# 65). Indeed, the payments made to State Street are contingent upon the amount of excess NOI from the rental of the units in the complex. The claims thus are different in kind, species, and character. Accordingly, there is a reasonable nondiscriminatory basis for the separate classification. As a result, the Court finds that the Bankruptcy Court did not err in finding a basis for separate classification of the unsecured creditors. *See, e.g., In re Johnston,* 21 F.3d at 328 (bankruptcy court did not err in confirming plan where unsecured creditor embroiled in litigation and depending on outcome of litigation could receive entire claim before other class of unsecured creditors).

■ State Street further asserts that the classification scheme discriminates against it. Section 1129(b)(1) of the Code prohibits unfair discrimination and requires that a plan be "fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan." 11 U.S.C. § 1129(b)(1). A classification scheme satisfies this requirement if there are reasonable, nondiscriminatory reasons for it. *In re Johnston,* 21 F.3d at 328. As noted above, there are reasonable, nondiscriminatory reasons for the separate classification of the

unsecured claims. The Bankruptcy Court did not err on the basis of unfair discrimination in confirming the Plan. *See In re Johnston,* 21 F.3d at 328.

## B. Valuation of Elmwood Villas

■ The Court reviews findings as to the value of property as a finding of fact, under the clearly erroneous standard. *See In re Johnston,* 21 F.3d at 326; *In re Fowler,* 903 F.2d at 696.

■ At the evidentiary hearing for the confirmation of the Plan, Mr. Lon Nelson testified as an expert witness for Elmwood. Mr. Nelson gave an as-is valuation of the property as of March 21, 1994. He considered the availability of only 88 units on the property, since most units were destroyed or vandalized, several units were being occupied by Metropolitan Police Department officers, and others were occupied by on-site management. Mr. Nelson gave a market value appraisal, based on location risks and other factors due to the crime problem on the property, in the amount of $750,000. Mr. Nelson testified that more units could be made available, but that the basic gang-related criminal activity may not make that practical or feasible.

On cross-examination, Mr. Nelson went through his calculations based on the availability of 140 units. He then gave a property value of $2,210,000.

Mr. Kelvin Don Dunn testified for State Street. Dunn gave an adjusted property valuation of $2,525,000 as of August 4, 1994. He assumed that an investor would rehabilitate the interior and exterior of the complex and pay delinquent taxes with an initial outlay of $587,770. Dunn further assumed an increased rental rate after the apartments were rehabilitated.

State Street now asserts that the Bankruptcy Court erred in finding that the value of the property was $1,500,000. However, after the evidentiary hearing, the Bankruptcy Court stated the following:

> I'm inclined to accept what Mr. Nelson had to say and would agree that as is the value is probably somewhere between 1.1 and $1.5 million.

The problem with that approach though is that while with a relatively small amount of infusion, something in the area of 50,000, and in a short couple of weeks time—or at most a couple months time—at the rate of ten units a month you immediately get up to a higher value. So I think that it's unfair to appraise it, the property, in a value that takes into account a very short-term, what I would consider to be a very short-term, condition of the property—and that is a vacancy factor in the area of 50 percent.

In spite of the area where it's located, it's obvious that a stabilized vacancy factor would be much higher, and because of that it makes sense to me to appraise it at a value consistent with the higher vacancy rate. That means to me that probably the property, the stabilized rate, and with an appropriate infusion, after an infusion of moneys sufficient to cure deferred maintenance—not all of it, especially not maintenance that doesn't make any sense to perform—but at least deferred maintenance which is necessary to continue the property at a higher vacancy rate, vacancy factor, that the property is probably worth somewhere between 1.5 million to $2 million. Now that's certainly lower than Mr. Dunn appraised it at. But I also accept the fact that on a permanent basis there's a limit to what you can do in the neighborhood for a long period of time, and that depresses the price, depresses the value.

*See* Transcript (# 96), pp. 226–27. In its ruling, the Bankruptcy Court, considered the current vacancy level, weighed and considered the testimony of both experts, found that some maintenance was necessary but that the initial outlays relied on by Mr. Dunn were unreasonable, and found that an appropriate value lay within the figures offered. *Id.* This is entirely within the discretion of the Bankruptcy Court. *See In re Johnston,* 21 F.3d at 326; *In re Fowler,* 903 F.2d at 696.

The following day, Elmwood proposed to stipulate to a valuation of the property at $1.5 million, within the range the Bankruptcy Court had indicated would be acceptable. Considering the other modifications, such as the cash infusion, the Bankruptcy Court approved the Plan as modified, as consistent with its earlier findings. The Bankruptcy Court did not abuse its discretion in so finding. *See In re Johnston,* 21 F.3d at 326; *In re Fowler,* 903 F.2d at 696.

### C. Interest Rate

The Court reviews findings regarding appropriate interest rates as a finding of fact, under the clearly erroneous standard. *See In re Johnston,* 21 F.3d at 326; *In re Fowler,* 903 F.2d at 696.

Cheryl Santor, Elmwood's expert witness, testified at the evidentiary hearing that a standard commercial loan could be obtained at between 2 to 3% over the prime rate of 6.81%. This assumes a borrower with good credit and an equity cushion of between 25 to 35%. Ms. Santor also stated that banks abstain from financing apartment complexes because of their high-risk nature and unsteady income stream. However, Ms. Santor did not evaluate the potential for a loan with regard to the Elmwood Villas property.

Connie Farris is a mortgage broker who testified for State Street. Ms. Farris stated that no lender she contacted would finance a loan on the Elmwood Villas. She also testified that if financed, the lenders would loan at a rate of between 9.5 percent to 14 to 15 percent, or between 2.7% and 8.2% over the prime rate.

At the evidentiary hearing, the Bankruptcy Court stated:

> Your witness from Security Bank testified that if the loan were available from that bank, it would be in the range of prime plus two or three. I gather from her own testimony that a loan would not be available from that bank for this kind of loan. It's probable that this loan would be very difficult to obtain; and that if it were to be obtained, your starting point would be prime plus two to three, plus additional risk factors.
>
> . . . .
>
> Probably if I were picking it without consideration of any other factors, I would say it ought to be around prime plus four

percent based upon the evidence just that I've had here today. I would probably confirm, or there is some probability that you could confirm, a plan that prime plus three percent based upon the witness testimony from Security Bank.

*See* Transcript (# 96), p. 232. The Bankruptcy Court then went on to confirm a plan that included an interest rate of 3% over prime. This finding is not clearly erroneous. *See In re Bloomingdale Partners,* 155 B.R. 961 (Bankr.N.D.Ill.1993); *Matter of IPC Atlanta Limited Partnership,* 142 B.R. 547, 558 (Bankr.N.D.Ga.1992); *In re Oaks Partners, Ltd.,* 135 B.R. 440, 447 (Bankr.N.D.Ga.1991).

### D. Absolute Priority Rule

■■■ The bankruptcy court must confirm a Chapter 11 reorganization over the objection of an impaired class "if the plan does not discriminate unfairly, and is *fair and equitable,* with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1) (1994) (emphasis added). A plan is fair and equitable only if

> (B) With respect to a class of unsecured claims—
>> (i) the plan provides that each holder of a claim of such class receive or retain an account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B). This section codifies the absolute priority rule. *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co., (In re Bonner Mall Partnership),* 2 F.3d 899, 906 (9th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994), *dismissed as moot,* —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). The rule requires that "a dissenting class of unsecured

creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (quoting *Norwest Bank Worthington v. Ahlers,* 794 F.2d 388, 401 (8th Cir. 1986)); *see also Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 116, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939).

■■■ The absolute priority rule is not without limitation. *In re Bonner Mall Partnership,* 2 F.3d at 906. Under the so-called "new value exception," a plan that allowed stockholders in the business that filed for Chapter 11 protection could receive stock in the reorganized debtor in exchange for contributions of added capital without running afoul of the absolute priority rule, even though a senior class was not paid in full.[2] *Id.* To qualify, former equity owners must offer value that is (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *Id.* at 908–09 (citing *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939)).

■■■ The Plan provides for a cash infusion by the sole shareholder of Elmwood in the amount of $150,000. State Street asserts that the new value offered is not substantial and therefore the Plan does not come within the exception to the absolute priority rule. The applicability of the absolute priority rule is a question of law reviewed by the Court *de novo. In re Johnston,* 21 F.3d at 328–39.

■■■ Substantiality "requires that the contribution be real and necessary to the successful implementation of a feasible plan." *In re Woodbrook Assocs.,* 19 F.3d 312, 320 (7th Cir.1994), *reh'g denied* (citing *In re Snyder,* 967 F.2d 1126, 1131 (7th Cir.1992)). A contribution that is a "merely nominal, or gratuitous, token cash infusion[ ] proposed primarily to buy cheap financing" does not qualify as substantial. *In re Snyder,* 967 F.2d 1126, 1131 (7th Cir.1992) (internal quo-

---

**2.** State Street asserts that no "new value" exception exists under the Code, citing *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The Ninth Circuit has considered this issue, and found that a new value exception does exist under the Code. *In re Bonner Mall,* 2 F.3d at 917. The Court is bound by Ninth Circuit precedent.

tations omitted). However, no mathematical relationship defines when a cash infusion is substantial. *Id.; see also In the Matter of Woodbrook Associates,* 19 F.3d at 320 ("[w]hether the infusion of new capital is 'substantial' is more a common sense determination than a mathematical calculation when the debtor comprises only a single real estate asset which is fully encumbered"). The inquiry depends upon the circumstances of the case. *In re Snyder,* 967 F.2d at 1131–32.

The Plan as initially proposed by the Debtor provided that the shareholder would only contribute $50,000. The Bankruptcy Court did not approve of this amount and stated:

> With respect to the absolute priority rule, I have to agree that the $50,000—in relation to this property and the improvements that have to be made—appears to be somewhat token, in several respects. Ms. Davis had compared the $50,000 to the amount of debt that's being discharged. There might be several other comparisons that are relevant. The most important comparison in my mind would be comparing the $50,000 with the amount of money that's necessary to rehab the project.

*See* Transcript (# 96), pp. 227–28. The following day, Elmwood proposed a Plan that would require the shareholder to sell her personal residence in order to contribute $150,000 for deferred maintenance and rehabilitation of the property. The Bankruptcy Court approved this amount orally, *see* Transcript (August 5, 1994), p. 16, and in its Order (# 70).

The cash infusion of $150,000 represents less than 4% of the unsecured debt discharged under the Plan. State Street asserts that the new value contribution should have been $500,000. However, the Court agrees with the Bankruptcy Court that the new value amount should be determined by a consideration of other factors, such as the amount needed to make the reasonable repairs. An amount of $500,000, while laudable, would not necessarily correct the underlying problems associated with the property, but may subject the property to continued vandalism. However, the $150,000 is a reasonable amount considering the deferred maintenance, the location of the property, and the crime problems.

The purpose of Chapter 11 is to successfully rehabilitate the Debtor. *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984). This Plan comports with the policy underlying Chapter 11 by preserving and rehabilitating the apartment complex to an appropriate level while allowing State Street to foreclose if the initial Plan payments cannot be made. Accordingly, the Court finds that a $150,000 cash infusion is appropriate and necessary under the circumstances. The Court further finds that the amount triggers the new value exception to the absolute priority rule. Accordingly, the Court finds that the Bankruptcy Court did not err in its approval of the Plan over State Street's objections with regard to the absolute priority rule.

### E. § 1111(b)(2) Election

State Street moved to elect treatment under § 1111(b)(2) on October 5, 1994. Under Fed.R.Bankr.P. 3014, a secured creditor may make a § 1111(b)(2) election "at any time prior to the conclusion of the hearing on the disclosure statement or within such later time as the court may fix."

Elmwood filed its initial disclosure statement (# 19) on February 22, 1994, and an Amended Disclosure Statement (# 30) on April 4, 1994. The Amended Disclosure Statement listed State Street's unsecured claim in Class 4, along with all unsecured claims.

The hearing on the initial disclosure statement occurred March 29, 1994. At no time prior did State Street make a § 1111(b)(2) election. The Bankruptcy Court approved the disclosure statement, as amended, by Order (# 31) dated April 5, 1994. That Order required that Elmwood's Amended Disclosure Statement and a Ballot conforming to Official Form 14 be mailed to all interested parties.

Elmwood then filed a document entitled Revised Amended Disclosure Statement (# 53) on June 30, 1994. This Revised Amended Disclosure Statement paralleled the disclosure statement previously approved

by the Bankruptcy Court, but in the section describing the Plan listed State Street's unsecured claim in a separate class from all other unsecured claims. This complied with the Order of the Bankruptcy Court allowing modification of the Plan. *See* Order (# 56).

State Street now argues that it may elect § 1111(b) treatment because (1) the Bankruptcy Court never approved the Revised Amended Disclosure Statement; and (2) the Plan, as revised, materially altered the position of State Street.

State Street never elected § 1111(b) treatment prior to the March 29, 1994, disclosure hearing. Accordingly, its motion was not timely filed under Fed.R.Bankr.P. 3014. This is not altered by the fact that Elmwood filed its modified Plan restating the disclosure statement.

 A secured creditor may change its decision regarding a § 1111(b)(2) election even after a court has approved a disclosure statement where the plan is subsequently modified in a manner which is materially adverse to the creditor. *See In re Keller,* 47 B.R. 725, 730 (Bankr.N.D.Ia.1985); *In re Century Glove, Inc.,* 74 B.R. 958, 961 (Bankr. D.Del.1987); *In re RBS Industries, Inc.,* 115 B.R. 419, 421 n. 2 (Bankr.D.Conn.1990). State Street asserts that the Plan "differed radically" from the initial plan because it classified State Street's unsecured claim separately from other unsecured claims. However, as discussed *supra,* the Bankruptcy Court did not err in confirming the Plan based on separate classification because the claims were different in kind, species, and character, and because there was a reasonable nondiscriminatory basis for the separate classification.

The Bankruptcy Court found that State Street was aware of the plan modification prior to the confirmation date and could have requested § 1111(b)(2) treatment in the alternative if the Bankruptcy Court had approved the modification. The Bankruptcy Court also concluded that late election would work severe prejudice to the Debtor. The Court agrees with the Bankruptcy Court's interpretation. Accordingly, the Court finds this modification was not materially adverse to State Street and that State Street is not entitled to elect treatment under § 1111(b)(2).

IT IS THEREFORE ORDERED THAT the Order of the Bankruptcy Court confirming the Debtor's Chapter 11 Plan for Reorganization is AFFIRMED.