**In re James Bronce HENDERSON, III, Debtor.**

**No. 9:02–BK–16887–ALP.**

United States Bankruptcy Court, M.D. Florida, Fort Myers Division.

Jan. 26, 2005.

---

Asher Rabinowitz, Tampa, FL, for Debtor.

*AMENDED ORDER ON CONFIRMA-*
*TION OF THE THIRD AMENDED*
*PLAN, AS MODIFIED* (Amending
Doc. No. 528)

ALEXANDER L. PASKAY,
Bankruptcy Judge.

THIS IS the next chapter in a seemingly endless battle between James Bronce Henderson, III (Debtor), and Van Buren Industrial Investors, LLC, and 6700 Development Associates, LLC, (the Objectors). To illustrate the history of this Chapter 11 case which was filed in this Court on August 29, 2002, the docket thus far has 519 entries, disregarding the notice entries; ninety percent of the entries relating to this Chapter 11 case are litigations between the Debtor and the only two antagonists of the Debtor, the Objectors. It should be helpful to briefly recap the underlying factual basis relevant to the commencement of this Chapter 11 case and the positions of the Objectors, vis-a-vis the Debtor.

At the time relevant, the Debtor was the president of DCT, Inc., (DCT), an automotive supply company in the metropolitan Detroit area. The Debtor as president of DCT guaranteed most, if not all, the major obligations of DCT, including two long-term leases entered into by DCT with the Objectors. In February 2002, DCT was placed into an involuntary Chapter 7 bankruptcy. In due course, the Bankruptcy Court in Detroit entered its Order for Relief and appointed a Trustee who has been, and still is, representing the estate of DCT in Detroit.

On August 29, 2002, the Debtor, faced with increasing collection pressures based on his guaranties of the primary obligations of DCT, filed for relief under Chapter 11 of the Bankruptcy Code in this Court. Shortly after the commencement of the case the Debtor sought the entry of an Order to fix the bar date to file claims, which was granted, and the Court fixed the bar date at December 16, 2002. The Objectors filed their respective Proofs of Claim. The Debtor promptly challenged the claims of both the Objectors, and filed his motions for summary judgment. Both motions for summary judgment were denied. In July 2003, this Court overruled the Debtor's objections to the claims of the Objectors but limited the amounts of each to the statutory cap provided by Section 502(b)(6) of the Bankruptcy Code. The Debtor properly filed a notice of appeal of this Court's decisions to the United States District Court for the Middle District of Florida. The Objectors also appealed contending that this Court erred in applying the statutory cap to their claims. Both these appeals are still pending before the District Court and, therefore, the parties are waiting for the decision.

During this Chapter 11 case the Debtor, with the help of his non-Debtor wife, Joann Henderson (Mrs. Henderson), has repaid all secured claims, totaling over $4,000,000. These claims include those of Homeside Lending (first mortgage on the condominium in Naples), Private Bank (first mortgage on the Heron Ridge house), Comerica Bank (second mortgage on the Naples condominium and on the Heron Ridge house, and the first mortgage on the Niblick Lane Homestead), and Betty G. Henderson Trust (third mortgagee on the Heron Ridge House).

The Debtor, notwithstanding the pendency of the appeals described earlier, filed several Disclosure Statements and Plans of Reorganization. Ultimately, on May 11, 2004, the Debtor filed the Third Amended Chapter 11 Plan of the Debtor (Doc. No. 374). On September 7, 2004, shortly before the scheduled confirmation hearing, the Debtor also filed his Modifications to Third Amended Chapter 11 Plan

of the Debtor (Doc. No. 460), which is what is presently under consideration (Third Amended Plan, as modified). Needless to say, the Objectors wasted no time and immediately challenged the Third Amended Plan, as modified.

The Debtor's Third Amended Plan, as modified, has 10 classes of creditors and parties of interest. They are as follows:

(1) Class 1: Comerica Bank, secured.

(2) Class 2: Private Bank, secured.

(3) Class 3: Secured claim of Oakland County Tax Collector.

(4) Class 4: Betty Henderson Trust, secured.

(5) Class 5: Claim of Theodora Henderson, the Debtor's ex-wife, unsecured.

(6) Class 6: Claim of Van Buren and 6700 Development, unsecured.

(7) Class 7: Administrative convenience claims with a cap of $20,000, unsecured.

(8) Class 8: Claims of ex-employees of DCT, unsecured.

(9) Class 9: Other general unsecured creditors.

(10) Class 10: Debtor's interest in properties.

As noted earlier, the Debtor settled all secured claims, thus, there are no longer any secured claims dealt with under the Plan. The claim of Theodora Henderson in Class 5 is unimpaired. The claims set forth in Class 6 (Van Buren and 6700 Development), Class 7 (Convenience class), Class 8 (Ex-employees of DCT), and Class 9 (Other unsecured creditors), are all impaired under the Plan.

The Debtor obtained an affirmative vote of acceptance of the Third Amended Plan, as modified, by all impaired classes except the Objectors. At that time, the Plan submitted to unsecured creditors in Class 8 provided a dividend of 10% on their allowed claims. The latest modification to the Plan has reduced the Class 8 dividend to 5%. The modification to the Plan was not formally submitted to the affected creditors, thus, did not allow them the opportunity to consider the change provided for by the modification. However, it is now represented to this Court by counsel for the Debtor that he has obtained a unanimous acceptance of this change from the attorney representing the creditors in Class 8. On December 27, 2004, counsel for the Debtor electronically filed an email exchange between himself and the attorney representing the creditors in Class 8, indicating that the members of the class accepted the modified treatments of their claims by reducing the dividend from 10% to 5%.

The Objectors, who are in Class 6, were originally offered two alternative treatments of their claims. Under Alternative (A) of the Third Amended Plan, as modified, Mrs. Henderson offered to transfer title to a residential home described as the Heron Ridge property located in Michigan, and a land contract with the current occupants of the residence identified as the Abrahams, to the Objectors. Under Alternative (A), the Objectors will have to pay the sum of $2 million to Mrs. Henderson and, in turn, the Objectors will receive title to the Heron Ridge property and the assignment of Mrs. Henderson's rights under the land contract to sell the property to the Abrahams for $2.7 million within one year. In addition, the Debtor also offered to pay to the Objectors $150,000 one year after the effective date of the Plan.

It should be noted that at one time the Objectors indicated their willingness to purchase the Heron Ridge property for the sum of $2,800,500. The Objectors rejected Alternative (A) due to the highly

speculative premise that the Abrahams will exercise their option to purchase the Heron Ridge property and will pay to the Objectors $2.7 million. The rejection of this proposition is fully justified.

In the Third Amended Plan, as modified, Alternative (B) offered the Objectors $800,000 cash subject to an escrow arrangement until all appeals involving this Court's Orders on allowances of the claims of the Objectors are exhausted. In short, the $800,000 will be kept in escrow and not released to the Objectors until the Debtor loses the appeal and, thus, the claims of the Objectors are allowed with finality. In addition, under Alternative (B) the Debtor offers 40% on the net proceeds he hopes to receive from litigation brought by the Debtor against J.E. Myles, Inc., J.E. Myles and Scott Myles his former business associates. The Objectors have also rejected Alternative (B) of the Third Amended Plan.

## FEASIBILITY OF THE THIRD AMENDED PLAN, AS MODIFIED

■ In order to meet the requirement of Section 1129(a)(11) of the Code as to feasibility of the Third Amended Plan, as modified, the Debtor offered to contribute funds he may receive from the sale of his 16.39% interest in the Fort Wayne Wizards, a minor league baseball team. However, the Debtor is willing to contribute his interest only to the extent that such payment is needed to meet the payment of $800,000 under Alternative (B) which will be held in escrow.

In addition, the Debtor proposed that he will borrow $490,000 from Comerica Bank and grant a mortgage to Comerica on his Niblick Lane Homestead as security on this loan and use the loan proceeds to partially fund Alternative (B). The Debtor will also use the $271,000 which is current-ly in escrow and earmarked for the payment of allowed unsecured claims and some administrative expenses, other than the allowed claims of the Objectors, to partially fund Alternative (B). In this connection, it should be noted that the Debtor does not propose to pay the administrative expenses in full because the administrative claimants agreed to the reduction of their claims and also agreed to take their payments over time. The payment due to the administrative claimants under the Plan will be secured by a second mortgage on the Niblick Lane Homestead. As additional funding for the Plan, Mrs. Henderson agreed to contribute 75% of the $700,000 in funds she expects to receive under the land contract from the Abrahams on August 31, 2005, for a total of $525,000 to fund the Plan.

At the conclusion of the confirmation hearing, this Court announced that based on the evidence it was satisfied that the Third Amended Plan, as modified, met the requirements of Section 1129(a)(1)(2)(3) and (11) of the Code. However, due to the total lack of persuasive evidence to establish the extent of the Debtor's interest in the Wizards, this Court stated that it was impossible to determine, based on this record, whether the Plan meets the requirements of Section 1129(a)(7)(the best interest test). This Court also indicated that the corollary of this issue which involves the new value to be contributed to the finding of the Plan by Mrs. Henderson, is sufficient to meet the requirements of the best interest test of Section 1129(a)(7).

## SECTION 1129(a)(7) (BEST INTEREST OF CREDITORS)

The Debtor intends to retain his interest in the following non-exempt assets.

| ASSET VALUE | FMV | LIQUIDATION |
|---|---|---|
| Wizards (16.39%)(D)1 | $200,000 | $100,000 |
| K & G Note (D)2 | $ 50,000 | $ 10,000 |
| Technology | | |
| Partners (D)3 | $ 10,000 | $ 5,000 |

| | | |
|---|---|---|
| Golf Membership, Oakland Hills Country Club(D)4 | $ 31,000 | $ 31,000 |
| State of Michigan, Tax Refund (J)5 | $ 23,500 | $ 23,500 |
| Art Work (J)6 | $ 50,000 | $ 20,000 |
| Stock in First Internet Bank(D)7 | $ 20,000 | $ 10,000 |
| Park Place in Beaver Creek, Colorado(J)8 | $ 10,000 | $ 5,000 |
| Jewelry9 | $ 6,000 | $ 3,000 |
| 2000 Ford F–150 Truck (D) | $ 10,100 | $ 5,000 |
| Totals | $410,600 | $212,500 |

Assuming that the Debtor's interest in the Wizards is $100,000 the total liquidation value of the non-exempt assets are approximately $212,500. On the other hand if the Debtor's interest in the Wizards is as high as $800,000, the total liquidation value of the non-exempt assets, is approximately $912,500.

As noted earlier, under Alternative (B) the Debtor proposed to contribute to the Plan some funds from the proceeds he will receive upon the sale of the Wizards. However, this contribution is limited to the amount needed to meet the requirement to pay $800,000 into the Plan.

In order to properly evaluate the Debtor's interest in the Wizards, a brief recap of the Debtor's involvement with the Wizards should be helpful. The Fort Wayne Wizards, LLC, (LLC) is a limited liability company in which the Debtor holds a 16.39% interest. The LLC acquired the minor league franchise team for $4,750,000. The purchase price of the team was partially financed by a loan obtained from Comerica and partially paid for by cash invested by the members in the LLC. The Debtor paid $500,000 for his fractional interest in the LLC. The Comerica loan was secured by the members of the LLC with pledges of their respective ownership interest in the LLC as collateral for the loan. The term of the loan was for five years and the current balance is approximately $940,000.

Since the formation of the LLC, there has been only one change in the membership when one of the members, Mr. Cherney, sold his 8.2% interest to Mr. Montrose. The membership interest was sold "as is" subject to the security interest of Comerica. Mr. Cherney received all proceeds of the sale. Contrary to the intimation of the Debtor that if his membership interest is sold in the LLC he will not receive any net proceeds because of the outstanding security interest of Comerica, this is not supported by the record nor would it make any economic sense.

Andrew Appleby (Appleby), who holds a fractional membership interest in the Fort Wayne Wizards, LLC, manages the team. The Debtor testified that his valuation of his interest in the LLC was based on an offer he allegedly received to sell his interest to the "majority owner for $100,000." The underpinning of the valuation of the Debtor of his interest in the LLC is none for the following reasons. First, the so-called offer was received not from a majority owner but from Appleby, whose interest in the LLC was even less than the percentage of the fractional interest of the Debtor. Secondly, there are no majority owners and the fact of the matter is that the Debtor's 16.39% is the largest fractional interest in the LLC. Lastly, Appleby denies that he made any offer to purchase the Debtor's interest and stated in his deposition that the amount discussed was merely mentioned as part of a nonspecific general conversation concerning the possible sale of the entire team. Appleby denied that he made a firm offer to purchase the Debtor's interest for $100,000 and the number was merely a range they discussed when valuing the Debtor's interest in the LLC.

Appleby considered the possible sale of the team. In this connection, Appleby mentioned he received two letters of intent indicating an offer to purchase the fran-

chise for a purchase price of $6 million to $7 million. However, neither of the offers has been consummated since neither potential buyer had the necessary financing. Whether they would be able to obtain the needed financing is an unanswered question. Appleby conceded the possible sale of the team is just a hope, an expectation, and a fervent wish which he hopes might turn into reality, possibly within six months. He further stated that if the team is sold the Debtor might receive approximately $800,000 for his interest. Appleby conceded that this is speculation at this time.

The Objectors, relying on the $800,000 estimate of the Debtor's interest in the LLC, contend that unless the Debtor is willing to devote all proceeds the Debtor receives for his interest of the sale of the Wizards to the funding of his Third Amended Plan, as modified, the Plan of Reorganization cannot be confirmed.

While there is no hard evidence in this record to support either the $100,000 value placed on the Debtor's fractional interest by the Debtor or the $800,000 estimated value of that interest by Appleby, in either case, the Debtor's proposal to deal with this non-exempt asset as currently proposed is unacceptable because it fails to meet the requirement of Section 1129(a)(7). Thus, unless the Debtor is willing to modify Alternative (B) by providing for the contribution to the Plan of all net proceeds he might realize from the sale of the Wizards the Plan as currently structured cannot be confirmed.

Be that as it may, it appears that there is a possibility that the Wizards will be sold and the Debtor certainly would receive a monetary return for his membership interest. This interest is non-exempt, and there is no reason or justification why the total amount the Debtor will receive for his interest of the sale of the Wizards

consummated prior to the closing of the estate, should not be devoted to fund the Plan.

The Objectors also point out that the Debtor intends to retain 60% of the proceeds hopefully to be realized from a suit filed by the Debtor against his former business partners. The value of this lawsuit is more questionable than the value of the Wizards discussed earlier. First, there is nothing in this record which sheds any light on a likelihood of success of this litigation. Secondly, there is no evidence to establish the ability to collect on a judgment if the Debtor prevails in this litigation. Thus, the Debtor's willingness to contribute 40% of the net proceeds from this litigation to fund the Plan is just as meaningless as the Objector's charge that the Debtor's failure to contribute all proceeds of the lawsuit to fund this Plan is an additional ground to deny confirmation.

The next non-exempt asset the Debtor intends to retain is his interest in artwork. The Debtor valued his interest in the artwork at $50,000 to $100,000. The Objectors place great reliance on the fact that the Debtor transferred part of his interest in the artwork to his wife postpetition without leave of Court. This, according to the Objectors, was a voidable transfer under Section 549 of the Code.

To consider the significance of the transfer in a vacuum certainly would permit the conclusion that the transfer is voidable under Section 549. However, to view this transfer holistically and not in a vacuum, the transfer assumes a far less significance than attributed to it by the Objectors. This is so because if the transfer is voided and the artwork in question is put back in the estate of the Debtor, the value of the artwork will be included in the non-exempt properties which the Debtor intends to retain, which then will only be relevant when one considers the best interest of

creditors test. On the other hand, if the wife retains the artwork transferred by the Debtor and pays an amount equal to the value of the artwork in question, the postpetition transfer is of no consequence. Whether a Trustee could realize that amount in Chapter 7 liquidation is highly questionable. This Court knows from experience that the results generally obtained by Trustees in Chapter 7 sales are only a fraction of the true value of the property sold.

In the present instance, the total amount of allowed priority administrative claims is greater than what a Trustee in a Chapter 7 could realize from the sale of the non-exempt assets involved.

Based on the foregoing, this Court is satisfied that the Alternative (B) of the Third Amended Plan, as modified, more than meets the requirements of Section 1129(a)(7)(A)(ii) provided, however, the Debtor is willing to devote all proceeds that he might obtain from the sale of the Wizards to the funding of the Plan. This is so because under the Plan each holder of an allowed claim will receive a dividend of between 35 and 40 percent and under a Chapter 7 they will not receive any dividend whatsoever. Thus, this Court is satisfied that Alternative (B) of the Third Amended Plan, as modified, with the additional change concerning the Debtor's interest in the sale of the Wizards, meets the requirements of Section 1129(a)(7) and it is in the best interest of the creditors. Accordingly, this Court is satisfied that if Alternative (B) is further modified by the Debtor to provide that the Debtor will contribute all net recovery from the sale of his interest in the Wizards and all net recovery from the lawsuit described earlier filed by the Debtor against his former business associates, that the Plan is fair and equitable and it meets the requirements of Section 1129(b)(2).

In addition to the foregoing, there is a more overriding and crucial issue that has to be resolved which relates to the Plan which, according to the Objectors, violates the "absolute priority rule" set forth in Section 1129(b)(2)(B)(ii).

## ABSOLUTE PRIORITY RULE
### § 1129(b)(2)(B)(ii)

■ In order to overcome the last and, obviously, the major obstacle to confirmation of the Plan is the fact that the Debtor intends to retain substantial amounts of exempt properties valued at $3,536,000 fair market value, with a liquidation value of $2,137,000. This, according to the Objectors, violates Section 1129(b)(2)(B)(ii), the absolute priority rule of the Bankruptcy Code.

It is without dispute that the Debtor intends to retain his interest in the following properties which he claims to be exempt.

| ASSET VALUE | FMV | LIQUIDATION |
|---|---|---|
| Niblick Homestead(D)1 | $3,400,000 | $2,000,000 |
| Cash Value of Insurance in a Second to Die Policy (J)II | $ 22,000 | $ 22,000 |
| Individual Retirement Account (D)III | $ 115,000 | $ 115,000 |
| Total | $3,536,000 | $2,137,000 |

■ It is the contention of the Objectors that the Debtor's unwillingness to contribute his exempt properties to the Plan as much as necessary to fully satisfy their claims means that the Plan cannot be confirmed because it violates the absolute priority rule. This Rule requires that a plan cannot be confirmed over the objection of a dissenting class unless a Debtor is able to persuade the Court that a plan is fair and equitable. Section 1129(b)(2)(B)(ii) of the Code defines the term fair and equitable and provides:

(C) With respect to a class of unsecured claims—

(ii) the holder of any claim or interest that is junior to the claims of such class

will not receive or retain under the plan on account of such junior claim or interest any property.

■ It is without question, as noted earlier, in the present instance that the Debtor intends to retain all properties he claims as exempt. It is equally clear that if a Debtor claims an exemption, in the absence of any objection to the claim, the exemption is allowed as a matter of law. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992). Since the unsecured dissenting class does not receive a full satisfaction of their claims under the Third Amended Plan, as modified, and the Debtor retains all of these exempt properties, it appears that under a strict interpretation of Section 1129(b)(2)(B)(ii), this Plan cannot be confirmed as it violates the absolute priority rule. *See, In re Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla.1989); *In re Johnson*, 101 B.R. 307 (Bankr.M.D.Fla.1989); *In re Gosman*, 282 B.R. 45 (Bankr.S.D.Fla.2002).

In order to overcome the impact of the decision supporting this approach and representing the controlling legal principles and the proper representation of law in this District, the Debtor contends that the absolute priority rule should not be applicable in a case of an individual in a Chapter 11 case, and should be limited and applied only to the retention of equity interest in entities. In support of this proposition, the Debtor contends that Section 1129(b)(2)(B)(ii) does not apply to individual Debtors for the following reasons.

(1) A contrary conclusion is antithetical to the purpose of exemptions;

(2) There is no such thing as an "interest" in an Individual;

(3) The Debtor's Interest in Exempt Property is Senior to Interests of Creditors;

(4) Exemptions are not "on account of" Debtor's Interest;

(5) A Chapter 11 Debtor should bear no greater burden than a Chapter 13 or Chapter 7 Debtor.

■ The Debtor's right to claim exemptions is governed by Section 522 of the Code. This Section is applicable to all operating Chapters including a Chapter 11 case, if the Debtor is an individual. It is beyond peradventure that individual Debtors are eligible for relief under Chapter 11. *See Toibb v. Radloff*, 501 U.S. 157, 166, 111 S.Ct. 2197, 2202, 115 L.Ed.2d 145 (1991). It is equally clear the Debtor's right to claim exemption under Chapter 11 is expressly recognized by 11 U.S.C. § 1123(c) of the Code. This Section provides that, "... a plan proposed by an entity other than the debtor may not provide for a use, sale, and lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale or lease."

It is clear from the foregoing that the Debtor's right to retain exempt properties is unaffected by Section 1129(b)(2)(B)(ii), because creditors cannot subject a Debtor's exempt property to an involuntary liquidation. However, it is contended that to impose the condition on a Debtor to forfeit some or all of his exempt properties is warranted because if a Debtor were permitted to retain exempt properties without giving maximum satisfaction to the impaired creditors, it would violate the absolute priority rule. Therefore, to give up the exempt properties voluntarily is a price that the Debtor has to pay at times in order to be able to use the cramdown provisions to obtain confirmation of a plan.

It is the contention of the Debtor, notwithstanding the holdings of the cases cited above that, in any event, Section 1129(b)(2)(B)(ii) does not apply to a case of an individual in a Chapter 11 case for the following reasons.

In order to support the proposition that the absolute priority rule does not apply to a case of an individual in a Chapter 11, the Debtor equates his Chapter 11 case with non-profit entity cases and relies on an approach of two Courts of Appeal who are faced with application of the absolute priority rule as applied to non-business entities who are seeking confirmation of plans of reorganization. *In re General Teamsters, Warehousemen and Helpers Union Local 890*, 265 F.3d 869, 872 (9th Cir.2001)(*Teamsters*) and *In re Wabash Valley Power Assoc'n, Inc.*, 72 F.3d 1305, 1313 (7th Cir.1995), *cert. denied*, 519 U.S. 965, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996)(*Wabash*).

In *Wabash*, the Seventh Circuit discussed the origin and current application of the absolute priority rule and stated as follows:

The most significant obstacle to confirmation of the Wabash Plan is the question of its compliance with the "absolute priority rule." As codified for the first time in the Bankruptcy Code, the rule provides that, in order for a bankruptcy plan to be approved in the face of the refusal of an unsecured creditor to accept it ("a cramdown"), the holder of any claim or interest junior to that of the dissenter may not "receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).

■ The rule thus stated has three components: (1) the identification of junior claims or interests; (2) the identification of any property retained by the holders of such claims or interests; and (3) the determination whether the property is retained "on account of" a junior claim or interest. The term "interest" in this context means equity interest....

In adopting the rationale of *Wabash*, the Ninth Circuit, in *Teamsters, supra*, at 873–84 stated:

The absolute priority rule is generally applied to for-profit corporations facing bankruptcy, where an equity owner seeks to retain property, often represented by stock.... The only apparent circuit decisions to deal directly with the issue of whether entities affiliated with not-for-profit organization have equity interest for purpose of the absolute priority rule held that they did not because the essence of an equity interest was an owner or an interest in the organization's profits. *See Wabash*, 72 F.3d at 1318–19.

The Debtor and Mrs. Henderson urge the word "interest" means only an equity interest in the Debtor's estate. The Debtor further states that the term "interest" refers to "equity security holders," and not an individual ownership of "any property," as used throughout Chapter 11. *See Wabash* at 1313 ("[t]he term 'interest' in this context means equity interest").

■ By logic one cannot refer to as the ownership of the interest of the Debtor in his exempt property as an interest in his estate. Once the exemptions are allowed the properties are no longer part of the Debtor's estate, and the Debtor does not retain property on account of such interest because he retains it as a matter of right by virtue of recognition of his right to exemptions. While it may be contended that if exempt property is not subject to the absolute priority rule this rule should equally apply to other properties of an individual Debtor. The difficulty with the logic of this argument should be evident when one considers the axiomatic fact that exempt property, once allowed, is no longer property of the Debtor's estate, but nonexempt properties are properties of a Debtor's estate.

■ The ordinary meaning of the term "junior" means a claim or interest that is

subordinate to other claims or interests which enjoy a higher rank. The word "junior" defined in Black's Law Dictionary, at p. 851 (6th Ed.1990), as "[a] legal right which is subordinate to another's right as applied to property..." The same meaning of "junior" is applied throughout the entire Bankruptcy Code. It is clear that the Debtor's interest in exempt property can never be junior to the interest of creditor's including the claim of dissenting unsecured creditors. This is so because unsecured creditors could never reach exempt property outside of bankruptcy, and such properties are immune and not subject to liquidation under any of the operating Chapters of the Code.

Section 522 (c) of the Code provides, in pertinent part, "...property exempted under this Section is not liable during or after the case for any debt of the debtor that arose ...before the commencement of the case...." Giving unsecured creditors in a dissenting class veto power over a plan requiring exempt property to be given to such creditor's, is an incorrect reading of the Bankruptcy Code.

The Objectors point out, however, that it is unconscionable to permit an individual Debtor like the Debtor in this case to retain substantial exempt properties, close to $4,000,000, without offering a full satisfaction of allowed claims of unsecured creditors, particularly the claims of the Objectors. To carry this argument to its logical extreme would mean that no individual Debtor could retain any exempt property unless he or she were willing to forfeit all right to exemptions, including exemption for the family home and, as a result, be thrown into abject poverty in order to get confirmation and a fresh start in life unencumbered and freed from the financial vicissitude of his pre-filing past. The fact that the residence of the Debtor in this instance is valued in excess of $3,000,000 should not make any difference.

In sum, the bottom line is that it could not have been and was not the intention of Congress in enacting the absolute priority rule to compel a Debtor to forfeit his exemption rights, notwithstanding that they are uniformly recognized throughout all operating Chapters of the Code. While this result might be appalling in certain instances, the creditors are not without remedy. They could seek a denial of confirmation of a plan proposed by the Debtor whose plan is an attempt to abuse the system by obtaining a denial of confirmation on the basis that the plan failed to comply with Section 1129(a), which requires confirmation of a plan that is proposed in good faith.

Even assuming without conceding that the absolute priority rule applies to Chapter 11 cases involving individuals, the "new value" exception has been recognized by Courts that considered the application of the absolute priority rule. *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607(1999); *In re Elmwood, Inc.*, 182 B.R. 845(D.Nev.1995);

Thus, in reorganization of a "business," old equity still may succeed in keeping hold of the corporation, partnership, LLC or presumably, the sole proprietorship. These kinds of equity security holders, by providing new value in the form of money or money's worth necessary for the Debtor to survive, and reasonably equivalent to the participation of the equity security holder's interest in the venture, may retain an interest therein. Any confirmable plan would have to include some exempt property to be better than Chapter 7 liquidation.

In an individual wage earner Chapter 11 case, there is more reason to permit the

individual Debtor "new value" to achieve a cramdown over a dissenting class. An individual Chapter 11 Debtor who is not a sole proprietor should be able to confirm a plan that is "fair and equitable" to dissenting creditors, without a total liquidation of all his assets.

In the present instance, as noted earlier, the Debtor intends to retain non-exempt property and this provision would no doubt violate the absolute priority rule and would prevent confirmation of the Third Amended Plan, as modified, unless the Debtor submits sufficient "new value" to match or exceed the value of the non-exempt properties retained. As noted earlier, Mrs. Henderson, the non-Debtor wife, would contribute 75% of the proceeds to the Land Contract payment due from the Abrahams on August 31, 2005, in the amount of $525,000 to fund the Plan. The value of the total of the non-exempt assets to be retained by the Debtor is approximately $410,600 at fair market evaluation and has an approximate liquidation value of $212,500. These amounts include the valuation placed by the Debtor on the Wizards and, of course, an amount substantially less than the possible $800,000 value of interest placed on the Wizards by Appleby.

Since this Court already stated that the Debtor must devote all the proceeds from the sale of the Wizards to fund the Plan, the actual value of the Wizards is not relevant. Further, the new value cash contribution by Mrs. Henderson clearly exceeds the value of the non-exempt properties the Debtor intends to retain.

■ This Court in not unmindful that a Judge of this District in the case of *In re Yasparro, supra,* that if an individual debtor retained exempt property under the plan, the plan violates the absolute priority rule unless all creditors receive full and complete satisfaction of their claims. *See also, In re Gosman, supra.* This Court is constrained to reject the holdings of both *In re Yasparro,* and *In re Gosman,* and is satisfied that the individual debtor does not have to forfeit his exemption rights to which the debtor is otherwise entitled to in all operating Chapters of the Code as a price of obtaining confirmation of his or her plan of reorganization. See *In re Egan,* 142 B.R. 730, 733 (Bankr.E.D.Pa. 1992); *In re Shin,* 306 B.R. 397, 404 n. 17 (Bankr.Dist.Col.2004).

Based on the foregoing conclusions, this Court is satisfied that Alternative (B) of the Third Amended Plan, as modified, with the requirements of the further modification, does meet all the requirements of Section 1129(a), and it does not violate the absolute priority rule. Therefore,

Alternative (B) of the Third amended Plan, as modified, if it includes the provision of devoting the Debtor's entire interest in the Wizards, meets all requirements of Section 1129(a) of the Code, and it is fair and equitable and therefore, shall be confirmed, notwithstanding the dissenting vote of the creditors in Class 6, Van Buren Industrial Investors, LLC and 6700 Development Associates, LLC.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Alternative (B) of the Third Amended Plan, as modified, be, and the same is hereby, confirmed provided that the Debtor is willing to contribute all of the proceeds, if any, in the sale of his interest in the Wizards to the funding of the Plan, and that the Debtor is willing to contribute the net proceeds, if any, to the funding of the Plan from the lawsuit filed against his former business associates, J.E. Myles, Inc., J.E. Myles, and Scott Myles (Adversary No: 04–504)